## THE MONTANA.

### INSURANCE CO. OF NORTH AMERICA v. LIVERPOOL & GREAT WESTERN STEAM CO.[1]

### PHŒNIX INS. CO. v. SAME.[1]

*(Circuit Court, E. D. New York. July 31, 1884.)*

1. STRANDING OF VESSEL—JURISDICTION—COMMON CARRIER—EXEMPTION IN BILL OF LADING FROM LIABILITY FOR NEGLIGENCE.
   (See head-note in same case in the district court, 17 FED. REP. 377.)
2. SAME—NEGLIGENCE IN NAVIGATION—BURDEN OF PROOF—SUBROGATION OF INSURERS.
   (See 17 FED. REP. 377.)
3. SAME—CASE STATED.
   (See 17 FED. REP. 377.)
4. SAME—NEGLIGENCE IN NAVIGATION—ERROR OF JUDGMENT.
   *Held*, that the master, in determining on the course to run on changing from E. ¾ S., was bound not to ignore the fact that he had taken no cross-bearings of the South Stack light; and that, though failure to take such bearings might not, alone, be enough to convict him of negligence, still, the recollection of that fact, coupled with the recollection of the fact that he first saw the South Stack light in so unexpected a direction, and believed he passed it at so unusual a distance, together with the failure to see the Skerries light on losing the South Stack light, and the hearing the North Stack gun abaft his starboard beam, stamp his action after hearing the gun as negligence and not error of judgment.
5. SAME—BILL OF LADING—BENEFIT OF INSURANCE.
   The provision in the through bills of lading that "the carrier so liable shall have the benefit of any insurance that may have been effected upon or on account of said goods," applied only to the transportation to New York and not to the ocean transit.
6. SAME—ACT OF 1851—REPEAL OF PROVISO.
   The proviso in section 1 of the act of 1851, (9 St. at Large, 635,) that nothing in that act contained should prevent parties from making such contract as they pleased, extending or limiting the liability of ship-owners for negligence of their employes, is repealed by force of section 5596 of the Revised Statutes.

The three cases named above were tried and argued together. In the first case (*Insurance Co. of North America* v. *Liverpool & Great*

*Western Steam Co.*) the court (BLATCHFORD, Justice) made and filed the following findings of fact:

The respondent, the Liverpool & Great Western Steam Company, Limited, is a corporation organized under the laws of Great Britain, and in the month of March, 1880, and for a long time prior thereto, was the owner of the steamer Montana. The libelant, the Insurance Company of North America, has been for many years, and still is, a corporation duly organized and existing under and by virtue of the laws of the state of Pennsylvania, for transacting the business of insurance, including marine risks. During said time it had an agency in London, England, for the adjustment and settlement of losses, and the losses referred to herein, except the losses on the Logan and Preston shipments of grain, were adjusted by said agency, and were paid through it in London. The Montana was an ocean steamer built of iron, and performed regular service as a common carrier of merchandise and passengers between the ports of Liverpool, England, and New York, in the line commonly known as the Guion Line. By her and by other ships in that line, the respondent was such common carrier. On the second of March, 1880, the Montana left the port of New York, on one of her regular voyages, bound for Liverpool, England, with a full cargo, consisting of about 2,400 tons of merchandise, and with passengers. She stopped at Queenstown on the afternoon of the twelfth of March, and thence proceeded on her voyage. She passed Tuskar rock, on the extreme south-eastern portion of Ireland, at about 8 o'clock in the evening of the twelfth of March, and thence took a course up and across the Irish channel. The course she took would obviously have carried her outside of the range of the South Arklow light on the east coast of Ireland, but, with the winds, tides, and currents as they were that night, she passed within range of that light, and about nine miles off, at 9:45 P. M. On passing the South Arklow light, the next light which those in charge of the navigation of the Montana expected to make was the South Stack light, on the coast of Wales, at the entrance of Holyhead bay. The master of the Montana was on the bridge, and in charge of her navigation.

The light-house on South Stack carried two lights. One, the high light, was about 170 feet above high water. It was white in color, and exhibited in all directions at sea, with a range of from 20 to 30 miles in clear weather. It was a revolving light, making one complete revolution in six minutes, and it showed a white flash light every minute. The other light was also white. It was about 40 feet above high water, and was a semi-revolving light, exhibiting every minute and a half in all directions between E. N. E. and W. by N. Its range in clear weather was from three to four miles, but it was regularly lit only in foggy or thick weather. Both of these lights were lit and burning all through the night of March 12th. A fog-bell was regularly sounded at South Stack from 10 o'clock in the night of March 12th until 6 o'clock in the morning of March 13th. The bell weighed two and a quarter tons, and was operated upon by a hammer weighing about 96 pounds, which struck the bell on the outside at intervals of 15 seconds, and was worked by means of clock-work and a caloric engine. The sound was a powerful one, and its range was from three to four miles. The high light on the South Stack was established in 1809, and has ever since been regularly maintained. The fog-bell had been established for about 20 years, and has since then been regularly sounded in foggy weather. About E. N. E., magnetic, from South Stack and distant about one mile therefrom was a fog-gun station, known as North Stack. The fog-gun station had been established about 20 years, and from midnight of March 12th until 4 o'clock in the morning of March 13th the fog-gun was fired regularly every 10 minutes. The gun was a 24 pounder, and was each time charged with three pounds of powder and a large junk wad, to give extra sound, the range of the sound being between five and six

miles, when the fog was thick, with the wind, and about seven miles when the fog lifted. The fog-gun station, since it was established, has been regularly maintained, and the fog-gun fired regularly in foggy weather. About two miles E., magnetic, from North Stack was the Holyhead Breakwater light-house. This light-house was at the outer end of Holyhead Breakwater, and it carried a fixed red light at a height of from 60 to 70 feet above high water, with flashes every seven and a half seconds. The range of the light in clear weather was from three to four miles, and the range of the flash was about 14 miles. The light was established in 1873, and has since been regularly maintained. At the Breakwater light-house was a fog-bell weighing about 500 pounds, which was operated upon by two hammers, worked by clock-work, and striking the bell on the outside three times in quick succession, at intervals of 15 seconds. The range of the sound was from a mile and a half to two miles. The bell was established in 1873, and was regularly rung in foggy weather. It was in operation from midnight of the twelfth of March until 5 o'clock in the morning of the thirteenth of March. About five miles N. N. E., magnetic, from Holyhead Breakwater light-house, and across Holyhead bay, was the Skerries light-house. The Skerries light-house was about N. E., magnetic, from North Stack light-house, and distant therefrom between seven and eight miles. It was situated on a small island about two miles off Carmel Head, and about two or three miles N. N. W., magnetic, from Church bay. It carried a stationary white light between 80 and 90 feet above low-water mark, exhibiting in all directions at sea and in Holyhead bay, with a range of about 16 miles. It was burning all through the night of March 12th. It was established between 70 and 80 years ago, and has been regularly maintained since. There was at Skerries light-house a fog-horn or siren, worked by two powerful caloric engines at a pressure of 40 pounds to the square inch. The sound made was shrill and powerful, and had a range of eight miles in foggy weather, and the sound was regularly given from 10 o'clock at night of March 12th until half past 4 o'clock in the morning of March 13th, at intervals of three minutes. This fog-horn or siren had been established for several years, and it has been regularly maintained ever since.

All through the night of March 12th, until 5 o'clock in the morning of March 13th, a fog overspread the land surrounding Holyhead bay, and extended at times and to some extent into the bay and out to sea. The proper course of the Montana was to keep three or four miles off the land at the South Stack, and on a course about N. E. by E., magnetic, until she had the Skerries abaft her beam, and then to take a course about E. by S., magnetic, to Liverpool. There was a westerly variation of about two points between magnetic courses and true courses in the Irish channel and adjacent waters. The Montana, on a course about N. E. by E., magnetic, passed within a short distance of South Stack light-house, and saw the high light there between 1 and 2 o'clock in the morning of March 13th. It came into sight, bearing about S. E. by E., and about one point forward of the starboard beam of the Montana. Her officers expected to see it at a distance of about 20 miles off, bearing from E. N. E. to N. E. by E. When they saw it first they thought it to be 15 miles off, and they remained of that opinion. It passed out of sight abaft their beam, they supposing it was hidden by the horizon. The master of the Montana did not ascertain by cross-bearings (which he might readily have made) the distance at which he was from the light. He lost the light because it was shut out from him by a fog which intervened between it and the Montana, and thence he continued with his engines working at full speed, and giving the Montana a speed through the water of about 14 knots an hour, and on an E. $\frac{3}{4}$ S., magnetic, course, to which he had changed, which took him directly into Holyhead bay, until after half past 2 o'clock. Before this time a man had been stationed at the fog-whistle of the Montana, who regularly blew it. At about half past 2 o'clock the mas-

ter of the Montana heard the fog-gun on North Stack off his starboard quarter, abaft his starboard beam; and he thereupon changed the course of the steamer again to N. E. by E., magnetic, but he continued his engines at full speed until 2:45 A. M., at which time the engines were put at half speed, which gave the steamer a speed through the water of between nine and ten knots per hour. Five minutes later the shore loomed up through the fog on the starboard bow, and orders were given to slow and stop the engines, and to put them full speed astern. But before these latest orders could be executed, the Montana ran ashore at Clegyr Point, in Church bay. After leaving Tuskar, and up to 1 o'clock in the morning of March 13th, the Montana was running with a flood-tide. Then there was slack water, and she afterwards encountered an ebb-tide, which ran from three to four knots an hour. At no time that night were any soundings taken on board the Montana, though soundings would have indicated to her master that he was running rapidly on to the shore. The lights at Holyhead Breakwater and the Skerries were not seen by those in charge of the navigation of the Montana, and her lookouts and those in charge of her navigation did not hear the fog-bell at South Stack, or that at Holyhead Breakwater, or the siren at the Skerries, and they did not hear the fog-gun at the North Stack until it was on their quarter. When they lost sight of the South Stack light they were within range of the Skerries light, and ought to and would have seen it unless it was shut out by a fog. The water outside of Holyhead bay ranged from 20 to 80 fathoms in depth, while the water in Holyhead bay ranged from 5 to 17 fathoms in depth, regularly shoaling as the shore was approached. Almost immediately after the Montana ran ashore she commenced filling with water, and thereby her cargo was in large part destroyed or damaged. Portions of it were thereafter taken from the steamer and forwarded to Liverpool, and there delivered. The Montana was then floated and taken to Liverpool for repairs. Those in charge of the navigation of the Montana were negligent, in that, without having taken cross-bearings of the light at South Stack, and so determined their distance from the light, they took an E. ¾ S. course before passing the Skerries and without seeing the Skerries light; and in that they continued at full speed after hearing the fog-gun at North Stack; and in that they took a N. E. by E., magnetic, course, on hearing said fog-gun, instead of stopping and backing and taking a westerly course out of Holyhead bay; and in that they did not ascertain their position in Holyhead bay by means of the lights and fog signals, or by the use of the lead, or by stopping until they should by those means, or otherwise, learn where their ship was.

Part of the cargo of the Montana consisted of 16,190 13-60 bushels of wheat in bulk, and 251 15-60 bushels of wheat in bags, all of which had been shipped in good order and condition on board of the Montana, on the twenty-eighth of February, 1880, by Logan & Preston, merchants of the city of New York, to be delivered to their order at Liverpool, England, under a bill of lading which is Exhibit C to the consent signed by the proctors for the respondents herein, dated November 8, 1882, contained in the apostles. At or about the time of shipment, the libelant, on a policy of insurance issued by it to Logan & Preston, and their report thereon, insured the said Logan & Preston in the sum of $27,500 upon the said wheat, which sum was the true value of the said wheat, against all dangers and perils of the sea. Said policy of insurance, No. 52,059, is Exhibit A to said consent, and said report is Exhibit B to said consent. The said wheat was in part lost, and the remainder thereof damaged, by the stranding of the Montana, and on the fifteenth of March, 1880, Logan & Preston, who, at all times from the time of shipment and insurance, had been the owners of said wheat, abandoned the same to the libelant, which abandonment was accepted, and thereafter the libelant paid to Logan & Preston, on the fifth day of June, 1880, the sum of $15,000 on account of said loss, and on the twenty-first day of June, 1880, the sum of

$12,500, the balance of said loss. The libelant, after paying the necessary expenses of saving and marketing the wheat, received, as net proceeds of salvage thereof, the sum of £630, British sterling, on May 31, 1880, and the further sum of £436.15.10, on July 30, 1881. Part of the cargo of the Montana consisted of 245 boxes of meats, owned and shipped by Jacob Dold, a merchant of Buffalo, New York, under through bills of lading from Buffalo to Liverpool, England, there to be delivered to his order, which bills of lading are Exhibits H and I to said consent. The libelant insured said Jacob Dold under a policy and certificate of insurance, which policy is Exhibit G to said consent, and which certificate No. 31,024 is Exhibit J to said consent; said certificate being payable to the order of said Jacob Dold, upon the said boxes of meat, in the sum of $7,500, which was their value, against the dangers and perils of the sea. The said meats were consigned by Jacob Dold to Watson, Dunn & Co., of Liverpool, for sale on his account and risk. He at the same time forwarded to Watson, Dunn & Co. the said bills of lading and certificate of insurance. The said meats were shipped on board of the Montana at New York, in good order and condition. and were in part damaged, and in part totally lost, by the stranding of the Montana, and a portion thereof was abandoned to the libelant, and the abandonment was accepted. The libelant thereafter paid to Watson, Dunn & Co., on account of said loss and damage as correctly adjusted, £1,250, British sterling, on the eighteenth of May, 1880, and the further sum of £227.4.8, on the thirtieth of June, 1880, for which sums Watson, Dunn & Co. duly accounted to Jacob Dold. The libelant, after paying the necessary expenses of saving and marketing the meats abandoned to it, received, as net proceeds of salvage, on the twenty-sixth of May, 1880, the sum of £676.14.1, British sterling. Part of the cargo of the Montana consisted of 200 bales of cotton, shipped on board of the Montana at New York, by Samuel B. Jones, general agent, on account of Alexander Burgess, a merchant of Nashville, Tennessee, who owned the cotton, to be transported to Liverpool, and to be delivered there to order, under bill of lading which is Exhibit N to said consent. At or before the time of shipment, the libelant, under its policy No. 51,122, and its certificate No. 21,141, issued to said Burgess, said certificate being payable to his order, said policy being Exhibit L to said consent, and said certificate being Exhibit M to said consent, insured said Burgess, on said 200 bales of cotton, in the sum of $13,500, which was the value of said cotton, against all dangers and perils of the seas. The said Jones indorsed said bill of lading in blank, and delivered it to said Burgess, and said Burgess consigned the said bales of cotton to Brancker, Boxwell & Co., of Liverpool, England, for sale on his account and risk, and at the same time forwarded to them said bill of lading and certificate of insurance. The said bales of cotton were shipped on board the Montana, at New York, in good order and condition, and were partly lost, and partly damaged, by the stranding of the Montana, and a portion of the consignment was abandoned to the libelant, and it accepted the abandonment, and paid to Brancker, Boxwell & Co., on account of the correctly adjusted loss of and damage to the said bales of cotton, the sum of £319.19.9, British sterling, on the eleventh of June, 1880, and the further sum of £118.17.1, on the twelfth of September, 1881, for which sums Brancker, Boxwell & Co. duly accounted to said Burgess. The libelant, after paying the necessary expenses of saving and marketing the bales of cotton abandoned to it, recovered, as net proceeds of salvage, the sum of £157.19.6, British sterling, on the first of September, 1880.

### And the court also found the following conclusions of law:

The stranding of the Montana, and the consequent loss of and damage to her cargo, having been the direct result of the negligence of the master and officers of the steamer, the respondent is liable therefor. The libelant was

duly subrogated to the rights of the insured against the carrier for the loss of and damage to the cargo insured by the libelant, and is therefore entitled to recover from the respondent the amount of such loss and damage. The libelant is entitled to a decree against the respondent for the following sums, according to the report of the commissioner contained in the apostles: On account of the wheat, the sum of $27,500, with interest thereon from June 12, 1880, less the sum of $5,191.52 salvage, with interest thereon from September 1, 1880; on account of the meat, the sum of $3,895.77, with interest thereon from May 26, 1880; on account of the cotton, the sum of $3,313.39, with interest thereon from September 1, 1880; and for its costs in the district court, taxed at the sum of $201.08; and for its costs in this court, to be taxed.

In the second above-entitled case (*Phenix Ins. Co.* v. *Same*) the court made and filed findings of fact and conclusions of law similar to those in the first above-entitled case. And the court also made and filed the following opinion in the two cases mentioned above.

*William Allen Butler* and *Thomas E. Stillman*, for libelants and appellees.

*Franklin A. Wilcox*, for claimants and appellants.

BLATCHFORD, Justice. The libels in these cases allege the shipment of the goods on the Montana in good order, and the agreement of the respondent to deliver them in like good order at Liverpool; that she was one of a line of steamers that the respondent ran between New York and Liverpool; that the respondent was a common carrier of passengers and cargo between those ports; that the respondent received the cargo and passengers of the Montana on this voyage as a common carrier; and that the respondent failed to deliver the goods as agreed, but they were lost or destroyed and damaged by the stranding of the Montana. The particulars of the voyage and stranding are set forth, and it is alleged that the stranding and loss were due to the negligence of those managing the steamer in proceeding at too high a rate of speed, in not having a sufficient lookout, in going upon an improper and dangerous course, in not making due allowance for the influence of the ebb-tide, in not having or in not using and properly using the usual and proper outfit and appurtenances of an ocean steamer, and, among others, the lead and the compass, and in not so heeding the shore lights and signals as would have indicated to them her dangerous position, and would have enabled them to regain and keep in a position of safety. The libels allege insurance by the libelants on the goods to amounts equal to or less than their value, payment of or liability for moneys as and for the total loss or damage of the goods, damage equal to or greater than the amount of the insurance, and the subrogation of the libelants to the rights of the assured for the breaches of contract by the respondent.

The answers deny that the respondent was a common carrier. They set up as defenses that the Montana was registered at Liverpool, which was her home port, where the respondent carried on its business, having an agency at New York; that the goods were received under bills of lading, which constituted the contracts; that the respond-

ent assumed no greater risks than are expressed in the bills of lading; and that the loss or damage to the goods was by perils of the sea, and by causes in respect of which the respondent was exempt from liability by law and by the bills of lading. The answers set forth the particulars of the voyage and the stranding, and deny negligence, and allege that in respect to the employment of a skilled and licensed master and officers, and the careful observation by them of the elements, and everything which would, in the exercise of ordinary human skill, enable them to determine and judge the position of the vessel, and to navigate her accordingly, and in respect to her seaworthiness and outfit, and everything within the reasonable limits of skill and foresight, the respondent complied with its contracts, and with all the requirements of law.

The bill of lading, Exhibit C, in the first-entitled case, is a through bill of lading issued at Nashville, Tennessee, headed, "Overland and Ocean Bill of Lading, Louisville & Nashville and South & North Alabama Railroad, and the Williams & Guion Steam-ship Company, from Nashville, Tennessee, to Liverpool, England." It covers 300 bales of cotton, stated to be "shipped in apparent good order," and "to be delivered in like good order and condition, * * * under the following terms and conditions, viz.: That the said L. & N. and So. & No. Ala. Railroads, and their connections which receive said property, shall not be liable for * * * loss or damage on any article or property whatever by fire or other casualty while in transit, or while in deposit or places of transhipment, or at depots or landings at all points of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on seas, rivers, lakes, or canals. * * * It is further agreed that said L. & N. and So. & No. Ala. Railroads and connections shall not be held accountable for any damage or deficiency in packages after the same shall have been receipted for in good order by consignees or their agents at or by the next carrier beyond the point to which this bill of lading contracts. * * * It is further stipulated and agreed that in case of any loss, detriment, or damage done to or sustained by any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment, or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods. And it is further agreed that the amount of the loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of said goods or property at the place and time of shipment under the bill of lading. This contract is executed and accomplished, and the liability of the L. & N. and So. & No. Ala. Railroads and their connections as common carriers thereunder terminates on delivery of the goods or property to the steam-

ship company at New York, when the liability of the steam-ship commences, and not before. And it is further agreed that the property shall be transported from the port of New York to the port of Liverpool by the said steam-ship company, with liberty to ship by any other steam-ship or steam-ship line, subject to the following terms and conditions, viz.: 'To be delivered  *  *  *  in the like good order and condition at the aforesaid port of Liverpool, (the acts of God,  *  *  * barratry of master or mariners,  *  *  *  loss or damage resulting from  *  *  *  risk of craft  *  *  *  at sea in craft or on shore, *  *  *  or any other accidents of the seas, rivers, and steam navigation, of whatever nature or kind soever, excepted; whether any one or more of all such exceptions arise, occur, or are in any way occasioned from or by the negligence, default, or error in judgment of the master, mariners, engineers, or others of the crew, or of any of the servants or employes of the ship-owners, or otherwise however.)  *  *  * Notice. In accepting this bill of lading the shipper or agent of the owner of the property carried expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed." The bill of lading is dated at Nashville, Tennessee, February 4, 1880, and is signed "B. F. Champe, G. A., Agent severally, but not jointly."

The bill of lading, Exhibit H, in the first-entitled case, is like Exhibit C, except that it is for 150 bales of cotton by other shippers, and is dated February 5, 1880. The bill of lading, Exhibit J, in the first-entitled case, is like Exhibit H, except that it is for 100 bales of cotton, and is dated February 12, 1880. The bill of lading, Exhibit P, in the first-entitled case, is dated at New York, March 1, 1880, and covers 22 boxes of bacon and four tierces of hams, shipped in good order, and to be delivered in like good order and condition, at the port of Liverpool, "(the act of God,  *  *  *  barratry of master or mariners,  *  *  *  loss or damage resulting from  *  *  * any of the following perils, whether arising from the negligence, default, or error in judgment of the master, mariners, engineers, or others of the crew, or otherwise howsoever) excepted, namely, risk of craft,  *  *  *  at sea in craft, or on shore,  *  *  *  or from the consequences of any damage or injury thereto, howsoever such damage or injury may be caused,  *  *  *  stranding, or other peril of the seas, rivers, or navigation, of whatsoever nature or kind soever, and however such  *  *  *  stranding, or other peril may be caused. *  *  *  In accepting this bill of lading, the shipper, or other agent of the owner of the property carried, expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed."

The bill of lading, Exhibit C, in the second-entitled case, is like Exhibit P in the first-entitled case, except that it is for 16,441 28-60 bushels of wheat, in bulk and bags, by other shippers, and is dated February 28, 1880. The bill of lading, Exhibit H, in the second-entitled case, is a through bill of lading, issued at Buffalo, New York,

headed, "Foreign Bill of Lading. S. S. Montana, New York Central & Hudson River Railroad Company, and the Guion Line Steam-ship Company, from Buffalo to Liverpool." It covers 100 boxes of middles, stated to be shipped "in apparent good order," and to be "subject to all the conditions expressed in the customary forms of bills of lading in use by said steam-ships or steam-ship company at time of shipment," and "to be delivered in like good order and condition, * * * under the following terms and conditions, viz.: That the said New York Central & Hudson River Railroad Company, and its connections which receive said property, shall not be liable * * * for loss or damage on any article of property whatever, by fire or other casualty while in transit, or while in deposit or places of transhipment, or at depots or landings at all points of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on seas, rivers, lakes, or canals. * * * It is further agreed that said New York Central & Hudson River Railroad Company and its connections shall not be held accountable for any damage or deficiency in packages after the same shall have been receipted for in good order by consignees or their agents, at or by the next carrier beyond the point to which this bill of lading contracts. * * * It is further stipulated and agreed that in case of any loss, detriment, or damage done to or sustained by any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment, or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods. And it is further agreed that the amount of loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of the said goods or property at the place and time of shipment under this bill of lading. This contract is executed and accomplished, and the liability of the New York Central & Hudson River Railroad Company as common carriers thereunder, terminates on the delivery of the goods or property to the steam-ship company at New York, when the liability of the steam-ship company commences, and not before. And it is further agreed that the property shall be transported from the port of New York to the port of Liverpool by the said steam-ship company, with liberty to ship by any other steam-ship or steam-ship line, subject to the following terms and conditions, viz.: To be delivered * * * in the like good order and condition at the aforesaid port of Liverpool, England (the act of God, * * * barratry of master or mariners, * * * loss or damage resulting from * * * risk of craft * * * at sea, in craft, or on shore, * * * or any other accidents of the seas, rivers, and steam navigation, of whatever nature or kind soever, excepted; whether any one or more of all such exceptions arise, occur, or are in any way occasioned from or by

the negligence, default, or error in judgment of the master, mariners, engineers, or others of the crew, or of any of the servants or employes of the ship-owners, or otherwise, however.)  *  *  *  NOTICE.  In accepting this bill of lading, the shipper, or the agent of the owner of the property carried, expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed." The bill of lading is dated at Buffalo, February 28, 1880, and is signed, "S. STRANDGUARD, Agent severally but not jointly," and also contains the words, "Buffalo, N. Y., to Liverpool, Eng., via New York." The bill of lading, Exhibit I, in the second-entitled cause, is like Exhibit H in the second-entitled case, except that it is for 145 boxes of bellies, shoulders, and middles. The bill of lading, Exhibit N, in the second-entitled case, is like Exhibit P in the first-entitled case, except that it is for 200 bales of cotton, and is dated March 2, 1880.

The question of negligence on the Montana has been severely litigated; but, on the facts found, there is no room for doubt as to the proper conclusion. Those facts are set forth in the findings of fact, and establish the negligence. It is not necessary to discuss the evidence. That was done in the decision of the district judge, and his views and conclusions are, in the main, satisfactory. Taking the account given by the master in his testimony, the district judge was of the opinion that it was untrue in important particulars; that it was not true that the ship ran only five minutes, and that at a slow speed, on an E. ¾ S. course; that if the master did not note the length of the time that he ran on that course, he was guilty of gross negligence; and that, if he did note the time, it was incumbent on him to state it truly, and he had not done so. The district judge was also of the opinion that the ship, instead of passing the South Stack at a distance of 15 miles, passed it close at hand, and that it was not true that the light changed its bearing to the master in one hour, with the ship at full speed on the course she was on, only two points. The district judge also commented upon the facts that the point marked by the master on the chart as that at which he lost the South Stack light, and changed his course to E. ¾ S., was a point where the Skerries light should have been in view, but was not; and yet it did not occur to him that that light and the South Stack light might be obscured by a fog, and that although both the South Stack light and the Skerries light ought to have been seen by him at the same time, if he was where he supposed he was, he did not allow a doubt to arise, nor exercise the reasonable care of using the lead when he changed his course to E. ¾ S.; that the inability to see either of the two lights while on the latter course was indicative of a fog even before the North Stack gun was heard; that the doubling of the lookouts and the blowing of the whistle indicated that a fog was thought of; that the testimony of the engineer that the engine went at full speed until just as the ship struck, is contradictory of the statement of the master that she ran at half speed on the E. ¾ S. course,

and slow after changing back again; and that to make this last change, after hearing the North Stack fog-gun abaft his starboard beam, and knowing what it indicated, and to keep on the new course, was a gross mistake. The conclusion of the district judge was that, on the master's own showing, he failed to use reasonable care and skill in navigating his vessel on hearing the North Stack gun; that such negligence caused the damage in question; and that it was not the result of a mere error of judgment.

In addition to the foregoing views, which are justified by the evidence, and involve the conclusion that the master, when he changed his course from E. ¾ S., had reasonable ground to believe that he had been mistaken all along as to the position of his ship, and mistaken as to the distance of the South Stack light from him during the time he saw it, it is to be remarked that, in determining on the course to run, on changing from E. ¾ S., the master was bound not to ignore the fact that he had taken no cross-bearings of the South Stack light. The failure to take such cross-bearings might not alone be enough to convict the master of negligence, but the recollection of the fact that he had not taken such cross-bearings, coupled with the recollection of the fact that he first saw the South Stack light in so unexpected a direction, and believed that he passed it at so unusual a distance, and with the failure to see the Skerries light in losing the South Stack light, and with the hearing of the North Stack fog-gun abaft his starboard beams, stamp his action after hearing the gun as negligence, and not error of judgment.

Stress is laid by the respondent on the provisions in the through bills of lading that "the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods." But that provision applies only to the transportation to New York, and not to the ocean transit. The terms and conditions of the transportation to New York by the railroads and their connections are separate and distinct in the through bills of lading from the terms and conditions of the ocean transportation. The agent signs as "agent severally, but not jointly." The terms and conditions of the ocean carriage contain no clause as to the benefit of insurance. No such clause is found in the bills of lading dated at New York, not issued in connection with railroad transportation. The clause as to non-liability for the negligence of the master or crew, or for any accidents of the seas, however happening, is common to all the bills of lading; and the respondent contends that under them it is not liable for the loss in these cases. The district judge held that the respondent was a common carrier. The evidence shows that the steamers of the line carried to Liverpool grain, provisions, and cotton, and brought back British products, iron, coal, salt, and dry goods; that they also carried passengers; that the respondent advertised for cargo and passengers, and carried general cargo; that it refused to carry what would taint other cargo, or be dangerous to passengers, or would

overload the vessel, but with those exceptions it took what cargo was offered, if the rate of freight was satisfactory; and that the ships sailed on regular advertised days, and had been running since 1866, and had a regular pier in New York and a regular landing-place in Liverpool. If this does not make the respondent and its ships common carriers, nothing can do so.

In 2 Kent, Comm. 598, it is said: "Common carriers undertake, generally, and not as a casual occupation, and for all people indifferently, to convey goods, and deliver them at a place appointed, for hire as a business, and with or without a special agreement as to price. They consist of two distinct classes of men, viz.: inland carriers by land or water, and carriers by sea." It is also there said that "in the aggregate body are included * * * owners of ships, vessels, and all watercraft, including steam vessels and steam tow boats, belonging to internal as well as coasting and foreign navigation." In 1 Pars. Marit. Law, c. 7, § 5, p. 173, it is said: "One who carries by water, in the same way and on the same terms as a common carrier by land, is also a common carrier; or, in other words, it is not the *land* or the *water* which determines whether a carrier of goods is a common carrier, but other considerations, which are the same in both cases," and a common carrier is said (p. 174) to be "one who offers to carry goods for any person, between certain *termini* as on a certain route."

It is contended for the respondent that a carrier of goods by a vessel may lawfully contract for exemption from liability for the negligence of his agents in charge of the navigation of the vessel. In *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344, the navigation company, a carrier by water, by a steam-boat between New York and Providence, carried goods for one Harnden, under an agreement that he alone should be responsible for the loss or injury of any property committed to his care, and that no risk was assumed by or should be attached to the company, as proprietor of the steam-boat. Harnden was an expressman who carried, on the steam-boat, under that agreement, money, in specie, for the bank. The boat was burned through the negligence of the company in the equipment of the boat and the stowage of cargo, and the negligence of her officers on the voyage. The court treated the company as liable as a carrier, and considered the question as to how far its special agreement had qualified its common-law liability. The court held that while a carrier might limit his liability by a special agreement expressly assented to by both parties, the agreement in that case could not be considered as stipulating for willful misconduct, gross negligence, or want of ordinary care, either in the seaworthiness of the vessel, her proper equipment and furniture, or in her management by the master and hands; that the burden was on the bank to show such negligence or want of care; that that was shown; and that the company was liable for the loss, notwithstanding the special agreement. In *Railroad Co.* v. *Lockwood*, 17 Wall. 357, a drover was traveling on a railroad on a stock train

to look after his cattle, on a free pass, under an agreement by which he assumed all risk of personal injury. He was injured while traveling on the stock train, and then sued the railroad company for damages. Negligence on its part was proved and found by the jury. The supreme court held that the case, on its facts, was one of carriage of the drover for hire. The distinct question raised, as stated by the court, was whether a railroad company carrying passengers for hire can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage.

The court says that a common carrier may, by special contract, limit his common-law liability; that that was held in *New Jersey Steam Nav. Co.* v. *Merchants' Bank;* and that the case of *Lockwood* seemed to be almost precisely within the category of the decision in 6 How.—the contracts in both cases being general, exempting the carrier from all risk, and the court in the case in 6 How. having held that it would not be presumed that the parties intended to include the negligence of the carrier or his agents in such exemption. The court then, in the *Lockwood* case, proceeds to examine the question whether common carriers may excuse themselves from liability for negligence. It reviews the course of decisions in New York on the subject, and concludes that the courts of New York had carried the power of the common carrier to make special contracts to the extent of enabling him to exonerate himself from the effects of even gross negligence; but it proceeds to examine the question as one of general commercial law, arising in a federal court administering justice in New York, and having equal and co-ordinate jurisdiction with the courts of that state. It then discusses the cases on the subject in Pennsylvania, Ohio, Maine, and Massachusetts, and cites those in other states, and English cases, and cases as to both passengers and goods in the supreme court. Among the cases as to goods were *York Co.* v. *Central R. R.* 3 Wall. 107, and *Express Co.* v. *Kountze,* 8 Wall. 342. In view of all these cases, it holds that a carrier, having a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, is a common carrier; that a special contract about its responsibility does not divest it of that character; that it cannot be permitted to stipulate for immunity for the negligence of its servants; that the business of a carrier is a public one, and those who employ the carrier have no real freedom of choice, and the carrier cannot be allowed to impose conditions adverse to public policy and morality; that freedom from liability for losses through sheer accident, or dangers of navigation, which no human skill or vigilance can guard against, or for losses of money, or valuable articles, liable to be stolen or damaged, unless apprised of their character or value, or for like cases, is just and reasonable, and may be stipulated for; but that a public carrier cannot stipu-

late for exemptions which are unreasonable and improper, and which amount to an abdication of the essential duties of his employment; that a stipulation for exemption from liability for negligence is not just or reasonable; that a failure to exercise such care and diligence as are due from the carrier is negligence; and that the carrier remains liable for the negligence if the exemption stipulated for is unlawful.

The court then formulates its conclusions thus: (1) A common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law. (2) It is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants. (3) These rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter. (4) A drover traveling on a pass, such as was given in that case, for the purpose of taking care of his stock on the train, is a passenger for hire. Although the case of *Lockwood* was one of a passenger and not of goods, the court took pains to say that the rules it laid down were applicable to a carrier of goods. The reason assigned was that the principles which demanded the existence of the rules in regard to passengers demanded that they should apply in regard to goods, though they applied with special force to passengers. Those principles were fully discussed in the opinion.

In *Express Co.* v. *Caldwell*, 21 Wall. 264, it is stated to be settled law that the responsibility of a common carrier may be limited by an express agreement, if the limitation be such as the law can recognize as reasonable, and not inconsistent with sound public policy; and the cases in 3 and 17 Wall. are cited as holding that such limitation cannot extend to losses by negligence or misconduct. This view is again asserted in *Railroad Co.* v. *Pratt*, 22 Wall. 123 and in *Bank of Kentucky* v. *Adams Express Co.* 93 U. S. 174. These cases involved goods carried on land. No legal distinction can be perceived between goods carried by a common carrier on land and goods carried by one on the ocean, in respect to this question. It is urged, however, that the contract here was to be chiefly performed on board of a British vessel, and to be finally completed in Great Britain, and the damage occurred in Great Britain, and that the law of Great Britain, which is asserted to be different from the law here, is applicable to the case. As to this suggestion it is sufficient to say that the answers expressly admit the jurisdiction of the district court asserted in the libels, and that it is not set up in the answers that the laws of Great Britain, or any other law than that of the forum, is applicable to the case, nor is the law of Great Britain, if it be different, proved as a fact. The case must be decided according to the law of the federal courts, as a question of general commercial law. Aside from this, it may be said that there was nothing in these contracts of affreightment to indicate any contracting in view of any other law than the recognized law of such

forum in the United States as should have cognizance of suits on the contracts.

As the libelants paid the losses and damage resulting from the negligence for which the respondent was liable, they were subrogated to the rights of the insured, and are entitled to maintain these suits to recover what they so paid. *Hall* v. *Railroad Cos.* 13 Wall. 367; *The Monticello,* 17 How. 152.

It is urged for the respondent that as the libelants insured these risks, and were paid for so doing, they should bear the loss; that by the contract the shipper was the insurer against the negligence, relieving the ship-owners of what would otherwise have been his risk, and reinsured the risk with the libelants; and that the agreement of the shipper to insure against the negligence gave him the insurable interest which he reinsured. The answer to this view is that the libelants insured the goods against the risks specified in the policies, which risks covered the damage in question, and that they are entitled to the rights of the shippers under the contracts; and, as the exemption agreed on would be of no avail as a defense to suits by the shippers, it is of no avail against the libelants in this forum. The policy of the maritime law to limit the liability of ship-owners is invoked, and it is urged that they ought to be allowed to limit their liability by contract. The liability of ship-owners is limited by statute, (Rev. St. §§ 4282–4289,) and the extent to which such limitation is thus allowed may be considered as indicating the views of congress as to how far legislation ought to prescribe exemption. It is said in *Railroad Co.* v. *Lockwood,* 17 Wall. 361, that these statutory provisions as then enacted in the act of March 3, 1851, (9 St. at Large, 635,) leaves the ship-owner liable to the extent of his ship and freight for the negligence and misconduct of his employes, and liable without limit for his own negligence. In section 1 of the act of 1851 there was a proviso that nothing in the act contained should prevent the parties from making such contract as they pleased, extending or limiting the liability of ship-owners. As to that clause, it is said in the same case that that proviso neither enacts nor affirms anything, but simply expresses the intent of congress to leave the rights of contracting as it stood before the act. But that proviso is not re-enacted in the Revised Statutes, and as a portion of the section containing it is embraced in a section of the Revision, the proviso is repealed by force of section 5596.

The amounts due to the libelants were ascertained by competent and sufficient proofs, the exception of the respondent to such competency and sufficiency having been waived and stricken out. There must be decrees for the libelants, with costs, for the amounts stated in the respective conclusions of law filed.