**AMERICAN BONDING & TRUST CO. OF BALTIMORE, MD., v. TAKAHASHI et al.**

(Circuit Court of Appeals, Ninth Circuit. September 9, 1901.)

No. 690.

1. CONTRACTS—CONSTRUCTION—EXTRINSIC EVIDENCE.

Where contracts require one of the parties to pay money to a person designated as "trustee," but without stating for whom or for what purpose he is trustee, the circumstances and negotiations leading up to and surrounding the transaction constitute its res gestæ, and may be given in evidence in an action to determine which party is responsible for a defalcation of the trustee, not for the purpose of altering the writings of the parties, but to enable the court to correctly construe their agreement.

2. SAME—CREATION OF TRUST—RESPONSIBILITY FOR ACTS OF AGENT AS TRUSTEE.

Plaintiff applied to the general agent, who was also local manager and secretary, of defendant, to furnish a bond to a railway company, to whom plaintiffs had contracted to supply laborers to be paid by them, the company requiring such bond to protect it from claims which the laborers might make against it for wages. The agent, as a condition to the furnishing of the bond, and for the protection of defendant, required the money to become due from the railroad company under the

contract to be paid to him as trustee, to be disbursed by him to the laborers, and the contract and bond accordingly provided that such money should be paid to the agent, designating him merely as trustee, and that he should pay the laborers therefrom, and pay over the remainder to plaintiffs. They also reserved the right to defendant to designate a new trustee at any time on notice to the other parties. These requirements were within the general authority of the agent, and were also expressly approved by defendant, which subsequently exercised the power given it to change the trustee. *Held*, that the agent, in his capacity as trustee, represented defendant, which was responsible for the faithful execution of his trust, and liable to plaintiffs for the sum due them from the trustee on an accounting.

In Error to the Circuit Court of the United States for the Northern Division of the District of Washington.

Hoyt & Haight, Preston, Carr & Gilman, John P. Hoyt, and L. C. Gilman, for plaintiff in error.

Shank & Smith and Corwin S. Shank, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The plaintiff in error was defendant in the court below to an action brought by the Oriental Trading Company, the amended complaint in which alleged, among other things, that the defendant to the action is a Maryland corporation, and during the times therein mentioned was doing a general bonding business in the state of Washington, having for its general agent and manager in that state one A. L. Campbell; that in February, 1899, the Oriental Trading Company agreed with the Great Northern Railway Company to furnish it with Japanese laborers for extra gang and section work along its road during the remainder of that year, the trading company being thereby required to give the railway company an acceptable bond indemnifying it against all claims for wages of the laborers to be so furnished; that pursuant to that requirement the trading company applied to the defendant to the action, the American Bonding & Trust Company, through its general agent and manager, Campbell, for an indemnity bond in the sum of $25,000, and that the defendant, by its said agent and manager, required, as a condition precedent to the issuance of such bond, and for the purpose of assuring it against loss thereon through failure of the trading company to pay the wages earned by the laborers, that the moneys earned by the trading company under the contract with the railway company should be paid to the said Campbell, and be by him disbursed directly to and in payment of the laborers, and that any sum remaining after such payment to the laborers should be paid over to the trading company; that the defendant bonding and trust company also reserved to itself alone the right to substitute another trustee in the place of Campbell, or to add further trustees, as it might see fit, to act jointly with him; that accordingly, on March 15, 1899, on receipt of a cash premium therefor, the defendant bonding and trust company prepared and executed, as surety, an indemnity bond to the railway company in the sum of $25,000, containing the terms and

conditions above mentioned, which bond was delivered to and accepted by the railway company; that the furnishing of laborers by the trading company to the railway company was continued under a similar agreement for the year 1900, and that the defendant bonding and trust company prepared and executed, on the 1st day of February, 1900, as surety, and delivered to the railway company, for a like further consideration passing to it, a new bond for $25,000, as a renewal of the previous bond of March 15, 1899, the new bond being executed upon the same conditions and containing the same requirements as the first; that for the purposes stated, and in pursuance of its contract, the railway company made payments to Campbell until the defendant bonding and trust company terminated his agency on the 15th day of July, 1900, at which time it appointed in his place John P. Hoyt, its resident vice president, as trustee under the bond; that the sums so paid by the railway company to Campbell, earned by and belonging to the trading company, aggregated $302,439.44, of which sum there was paid over to and on account of the trading company sums aggregating only $292,583.09, and that the remaining sum of $9,856.35 is withheld, which last-mentioned sum so received by the defendant bonding and trust company is long overdue, and which it refused to pay after demand therefor duly made, to plaintiffs' damage in that sum, with interest from July 15, 1900.  In addition to the denials contained in the amended answer of the defendant bonding and trust company of certain of the averments of the amended complaint, it set up that on or about the 16th day of February, 1899, the Great Northern Railway Company and two of the plaintiffs, namely, C. T. Takahashi and O. Yamaoka, entered into an agreement, a copy of which is set out in the answer, which is in the form of a letter addressed by the assistant general superintendent of the railway company to the plaintiffs just named, referring to a recent conversation between them in regard to the employing of Japanese laborers on the Western division of the railway company, and stating the willingness of the company to employ such laborers for extra gang and section work on certain terms set out in the letter, and concluding with the statement that, "You will be expected to furnish the railway company with suitable bond indemnifying them from all claims for wages of the men supplied under this agreement"; that thereafter, and on or about the 15th day of March, 1899, the plaintiffs Takahashi and Yamaoka, as principals, and the defendant bonding and trust company, as surety, executed to the railway company their bond, which is set out at large in the answer, and that thereafter, to wit, on or about February 1, 1900, the railway company, as party of the first part, and the plaintiffs composing the Oriental Trading Company, as parties of the second part, entered into another agreement, also set out at large in the answer, by which the trading company agreed to furnish the railway company during the year ending July 31, 1900, as many laborers as the railway company should require, upon certain stated terms and conditions, and upon the agreement "that all pay rolls for laborers employed under this agreement shall be made out in favor of A. L. Campbell, trustee, and all checks shall be sent to said trustee, who shall disburse by

checks drawn in favor of the laborers according to lists and books furnished by the party of the first part (the railway company), or its agents, and said trustee shall pay the balance, after all claims are paid, to the parties of the second part" (the trading company). That contract also contained a provision to the effect that the trading company should give a bond, with the American Bonding & Trust Company of Baltimore as surety, in the sum of $25,000, conditioned for indemnifying the railway company from all loss and damage on account of any claims for wages of the laborers furnished under the agreement. The answer also alleged the execution of that bond, and set it out at large, among the recitals of which was the following:

"And whereas, said principal obligors [the copartners constituting the Oriental Trading Company] and said obligee [the railway company] by said agreement agreed that all checks for labor due said principal obligors should be paid to A. L. Campbell, trustee, of Seattle, Washington, who shall disburse by checks drawn in favor of the laborers according to the lists and books furnished by said obligee or its agents, and said A. L. Campbell should pay the balance, after all claims are paid, to said principal obligors; the surety having and reserving on notice to the obligors and obligee the right to designate another trustee, or to add trustees to act hereunder, as it may see fit: Now, therefore," etc.

The amended answer also alleged that all of the money paid to Campbell was paid, under and in pursuance of the agreements and bonds mentioned, as trustee for the trading company, and not otherwise; that the latter agreed to and did pay Campbell for his services as trustee the sum of $15 a month during all of the time he so acted; that on or about the 24th of August, 1900, the railway company and the trading company entered into a supplemental agreement reciting the agreement of February 1, 1900, and substituting in place of Campbell John P. Hoyt, of Seattle, and providing "that all pay rolls shall be made out in favor of said John P. Hoyt, trustee, and all checks shall be sent to said trustee, who shall disburse by checks drawn in favor of the laborers according to lists and books furnished by the party of the first part (the railway company) or its agents, and said trustee shall pay the balance after all claims are paid to the parties of the second part" (the trading company), and continuing in force the contract of February 1, 1900, in all other respects. And the amended answer avers that after the execution of that supplemental agreement Hoyt received the checks and money due from the railway company for wages of laborers furnished by the trading company under the agreements mentioned, and disbursed the same in accordance with the terms and conditions of the agreements and bonds. The replication of the trading company admits that the contract of February 16, 1899, was made with Takahashi and Yamaoka, but alleges that at the time of its execution M. Tsukuno was a member of the copartnership, and that the contract was made on behalf of the firm; and similar averments are made in respect to the bond executed on the 15th day of March, 1899. The replication put in issue the averments of the amended answer in respect to the payment by the trading company to Campbell for his services as trustee or otherwise, and also denies that either Campbell or Hoyt was trustee for the trading company; but alleges that each of them, during the time

of the receipt and disbursement by them, respectively, of the moneys, acted as agent, and at the sole instance, of the bonding and trust company.

The case was tried by the court with a jury. The parties agreed in respect to the amount of money received by Campbell and unaccounted for by him, and there is practically no conflict in the evidence. The only contested question in the case relates to Campbell's status in the transaction; that is to say, whether, in the receipt and disbursement of the moneys, he was, as contended on the part of the plaintiffs in the case, the agent and representative of the bonding company, or whether, as contended on the part of that company, he held the relation of trustee to all of the parties. Confessedly, he was the general agent, manager, and resident secretary of the bonding company in the state of Washington. In the agreements and bonds he is described as "trustee," but in neither is it stated for whom, or for what purpose. In such cases the circumstances and negotiations leading up to and surrounding the transaction constitute its res gestæ, and may always be given in evidence for the purpose, not of in any way altering the writings of the parties, but to enable the court to correctly construe their agreement. Railroad Co. v. Durant, 95 U. S. 576, 24 L. Ed. 391; Reed v. Insurance Co., 95 U. S. 231, 24 L. Ed. 348; Mechanics' Bank of Alexandria v. Bank of Columbia, 5 Wheat. 326, 5 L. Ed. 100; Baldwin v. Bank, 1 Wall. 240, 17 L. Ed. 534; Bank v. Kennedy, 17 Wall. 19, 21 L. Ed. 554. The case last cited was brought by Kennedy, as receiver of the Merchants' National Bank, against the National Bank of the Metropolis, to recover a balance alleged to be due on a check for $50,000, drawn by one Robinson on the Bank of the Metropolis in favor of the Merchants' National Bank, and duly presented for payment; on the presentation of which the Bank of the Metropolis admitted its obligation to pay it, but, as part payment thereof, delivered to the messenger of the Merchants' Bank a note of the cashier of that bank, one C. A. Sherman, for $20,000. The Merchants' Bank declined to receive the note as payment, and sent it back, demanding the cash, but the Bank of the Metropolis refused to take back the note, insisting that, although it was signed by Sherman individually, it was given for account of the Merchants' Bank, and for a loan made to it. The principal controversy in the case arose upon the question whether the note was given by Sherman on his own account or on account of the Merchants' Bank. The plaintiff in the case was allowed to prove by Sherman the circumstances under which the note had been given, the substance of which was that on the 27th of February he applied to Hutchinson, cashier of the defendants, for a loan to himself of $20,000 to enable him to purchase some stock in the Merchants' Bank, and that this note was given for that loan, with the certificate of the stock attached as collateral; and that he received therefor two drafts for $10,000 each on Baltimore and Philadelphia banks, payable to C. A. Sherman, cashier; that he indorsed them as cashier, and that the proceeds, when paid, went to the credit of the Merchants' Bank. The drafts being produced in evidence, the plaintiff's counsel then asked the witness what took place, when the drafts were about to be drawn, between him and

111 F.—9

Hutchinson, in regard to the form of the drafts. This evidence was objected to, was allowed, and an exception taken. The supreme court said:

"It is argued by the counsel for plaintiffs in error that this evidence was calculated to explain or vary the legal effect of the drafts themselves. We do not think so. Those drafts are not sued on in this action. They are introduced merely as part of the res gestæ of the loan, and the conversation of the parties on the subject of the drafts was also a part of that res gestæ. They equally constituted parts of the transaction. The witness might have preferred to receive the drafts in that form. He might have preferred to receive drafts payable to any third person. Evidence as to the reason why they were made in one form rather than another does not in the least vary or contradict the drafts themselves. As the form of the drafts might confuse the jury, the plaintiffs had a clear right to explain how they came to be made as they were. The fact in question was the loan. The circumstances of the negotiation constituted the res gestæ of the loan. The drafts were one of those circumstances; the conversation of the parties was another. Evidence of the reason why a loan was made in particular funds or securities, instead of cash, is perfectly competent where it will tend to elucidate the nature of the transaction, when that is the question at issue. The question here was whether the loan was made to Sherman or to the bank. The note given for the repayment of the loan was given by Sherman individually. The drafts in which he received the loan were made payable to him as cashier. Neither the one nor the other of these documents can prevent the parties from showing, as a matter of fact, to whom the loan was really made. The defendants were endeavoring throughout the cause, contrary to the form of the note, to show that it was really the obligation of the bank, and that the loan was made to the bank. This they had a clear right to do, as the plaintiff had an equally clear right to show the contrary. The principle which governs such cases was explained and enforced by this court in the case of Baldwin v. Bank. There was no error in the admission of this evidence."

In the present case the action is not upon the written agreements and bonds, but is an action for damages for the wrongful withholding by the alleged agent of the defendant company, and therefore for the wrongful withholding by the defendant itself, of moneys to which the plaintiff company is entitled. Whether or not the alleged cause of action is made out depends, as has been said, upon the real status of Campbell, which, for the reasons stated, must be determined in view of all of the facts and circumstances of the case.

Takahashi, one of the plaintiffs, testified that his firm made application for the bond required by the railway company to Campbell as agent of the bonding and trust company, saying:

"Mr. Maud, manager of J. Berkman & Brothers, introduced us to Mr. A. L. Campbell, the agent of the American Bonding & Trust Company, and we asked Mr. Campbell if he would furnish us a bond to be furnished for the Great Northern, and he asked us if we could give him collateral security for the bond; and we could not give him any security; and he says that if we can't give any security, why these moneys have got to go through their hands for the protection of the bonding company; and he said he would go and write to the East,—that is, to the headquarters of the bonding company at Baltimore, Maryland; and a few days afterwards—I don't remember how many days it was afterwards—he came and called on us, and said that he could go on the bonds, and finally he had the bond executed."

Campbell testified that the plaintiffs applied to him for the bond required by the railway company, and that he told them that they would have to agree that the moneys paid under their contract with

the railway company should be paid to and disbursed by a trustee, and that he was to be the trustee; that this was for the purpose of protecting the bonding and trust company; that he wrote to his company in regard to the matter, which letter, however, was not put in evidence, and received from it this reply:

"General Surety Business, Office of the Secretary-Treasurer.
"Baltimore, Md., Feb. 1st, 1899.

"A. L. Campbell, Esq., Bailey Building, Seattle, Washington—Dear Sir: We have your favor of the 25th ultimo, relative to the contract of the Oriental Trading Company with the Great Northern Railway Company, and from will be required a bond, indemnifying the railroad company against loss by reason of any default in the payment of the wages of the individual laborers. We note very carefully the stipulation you will make in the event you secure this bond. We think you take a correct view of the situation, and will approve your action, provided you will be willing to disburse the money to the laborers without any expense to us; i. e. that you will be willing to render the service stated in your letter in connection with the above matter, in consideration of the commission you secure on the premium of this bond.

"Very truly yours,                    Samuel H. Shriver, Sec'y."

The testimony is to the effect that the plaintiffs made Campbell presents from time to time for his services, which he received, but that no compensation to him by the plaintiffs was agreed on. The evidence also shows that Campbell made various acknowledgments of drafts sent to him by the railway company for the amounts due from time to time to the trading company, sometimes signing such acknowledgments "A. L. Campbell, Manager," and sometimes "A. L. Campbell, Trustee," and that he deposited the moneys in one of the banks of Seattle to his credit as trustee, and drew checks against the same from time to time in the regular course of the business of his office, such checks being signed, "A. L. Campbell, Trustee," and, so far as shown, all of them but two bearing the following counter signature: "This check will not be paid unless countersigned by the American Bonding & Trust Co., by Dorman;" those two excepted checks being countersigned, "A. L. Campbell, Trustee. Moore." Dorman, it appears, was the cashier in the company's office in Seattle. It further appears from the record that when the bonding company displaced Campbell from the management of its business in the state of Washington, and put another person in charge, it at the same time substituted that new agent in Campbell's place for the receipt and disbursement of the moneys under the contracts and bonds in question.

The plaintiffs in the case also put in evidence these extracts from a book of instructions sent by the plaintiff in error to its general agents and managers:

"It is, of course, understood that in the compilation of a book of this character it is impossible to formulate rules to meet all emergencies, the discretion of the representative of the company being largely relied upon, and he is expected to use the same care in all cases as if he personally were the only party interested. * * * Where any doubt is entertained as to the capability or intelligence of the applicant to properly administer the affairs of the trust, the agent must require him to deposit all funds in bank to the joint credit of the fiduciary and the company, so they can only be withdrawn on checks signed by both the fiduciary and the agent. The

securities should also be deposited in a safety-vault box, subject only to joint access. This is what is termed 'joint control,' and is recommended wherever practicable to enforce it, particularly in the cases of inexperienced persons, women unused to business practices, and small guarantyship. In times past this joint control was invariably required and rigidly enforced by all surety companies as one of the conditions only under which they would sign the bonds. It is required by some of them yet. But our experience has taught us that in many instances—large estates particularly—the requirements are ones meeting with frequent objections, and often the occasion for losing much good business, and that frequent reports and periodical investigations offer equal protection where the parties are businesslike and intelligent. But in case of any doubt as to the competency of the fiduciary it should be invariably required. In case of doubt as to the honesty or good character of the applicant, do not sign the bond under any circumstances, no matter what protection or indemnity is offered."

We are of the opinion that the court below was right in holding, as it did, that in the receipt and disbursement of the moneys Campbell was the representative of the bonding company, and, there being no substantial conflict in the evidence, that it rightly directed a verdict for the plaintiffs in the case. In executing the bonds and stipulating, as he did, that the moneys should be received and disbursed by himself, Campbell was clearly acting within the scope of his authority, as shown not only by the letter of the company to him of February 1, 1899, but also as disclosed by the foregoing extracts from the book of instructions issued by the company to its general agents. The requirement that the moneys should be paid to and disbursed by the agent of the bonding company was obviously for its protection, and was so declared by Campbell, and is so shown by the circular instructions of the company. In the latter "joint control" by the insured and the agent of the company of the funds for which the latter is to become liable is recommended in certain cases, but much is thereby left to the discretion of the agent. In the present instance the agent stipulated for his exclusive control of the funds, and his act in that respect was expressly approved by the company. The company thus held out Campbell as a fit and proper person to represent it in the transaction of its business in the state of Washington, and to receive and disburse the funds for which it should become responsible by the execution of the bonds issued by it, and, in the absence of any controlling rule of law to the contrary, should, upon the most obvious principles of fair dealing, be held responsible for his honesty. Fortunately there is no such rule. The bonding company not only selected the person who should receive and disburse the funds, selecting for that purpose its own general agent, but reserved to itself the exclusive right of substituting another in his place, thus reserving the right of discharging him for misconduct or other cause. It is this right which is the foundation of the rule of respondeat superior. Maxmilian v. Mayor, etc., 62 N. Y. 163, 20 Am. Rep. 468; Ham v. City of New York, 70 N. Y. 459; Railroad Co. v. Davis, 23 Ind. 553, 85 Am. Dec. 477. The case of Davis v. Patrick, 122 U. S. 138, 7 Sup. Ct. 1102, 30 L. Ed. 1090, cited by the plaintiff in error as decisive of the present case in its favor, is not, we think, at all so. That was an action by Algernon S. Patrick against Erwin Davis to recover, among other things, for services

rendered by him in the transportation of certain ore from the Flagstaff mine, in Utah Territory, to the furnaces at Sandy, in that territory. The question at issue was whether the services were rendered for Davis or for the Flagstaff Silver Mining Company, the owner of the mine. Algernon Patrick was employed by M. T. Patrick, who was in charge of the mine under J. N. H. Patrick, named as its manager in a certain contract entered into between the mining company and Davis, and also in a certain power of attorney executed by the mining company to J. N. H. Patrick, of date December 16, 1873. The purport of those papers is thus stated by the court (122 U. S. 149, 7 Sup. Ct. 1106, 30 L. Ed. 1094):

"The company owed the defendant £5,000, with interest at the rate of six per cent. per annum, for that amount advanced by him to it on the 12th of June, 1873. A further advance of money was necessary to enable it to carry on its business. The defendant agrees to advance to it not to exceed £10,000, in addition to the £5,000 already advanced. It had previously sold him a quantity of ore, which it had agreed to deliver to him at its ore house, free of cost, the cost of it having all been paid to the company by the defendant, and a balance of 4,995 tons being yet undelivered. In consideration of the premises, the company appoints J. N. H. Patrick manager of all its property in Utah, he, by himself or his agents, to have the exclusive and irrevocable management, except as thereinafter mentioned, of all its properties in Utah, and of all its mining and smelting business there. He is to conduct and manage the above business until such time as, out of the profits of the working of the properties, he has repaid to the defendant the £5,000 and interest; and also all moneys the defendant may advance to the company under the agreement, with interest; and also until he has mined and delivered to the defendant all the ore so sold to him by the company, as stated in the agreement; and also until he has smelted in the furnaces of the company the ore so to be mined and delivered to the defendant, according to the terms and agreement of September 12, 1873, made between the company and the defendant. When all this is done, J. N. H. Patrick may resign the management. He is to work the mine in a proper manner, and manage the business of the company with economy, and for the best interests of the parties to the agreement, and is to render a monthly statement, with vouchers, to the company at London. If at any time the defendant becomes dissatisfied with the management of the business and the property in Utah, he may suspend and remove the manager, and appoint another manager in his place, with any or all rights, powers, or authority delegated under the agreement; and, should the defendant proceed to act upon such power of suspension and removal, he is to consult with the board of directors of the company as to the new manager to be appointed. The power of attorney from the company to J. N. H. Patrick appoints him to be the attorney of the company to take possession of and carry on the mine, and for that purpose to appoint workmen and others, and to pay and allow them such remuneration as he shall think fit."

The court said:

"The relation between the defendant and the company was strictly that of creditor and debtor. The agreement of December 16, 1873, in connection with the power of attorney, was simply a method of securing the defendant, as a creditor of the company, for past and future advances, and to insure the delivery of the ore which he had bought and paid for. The irrevocable character of the appointment of J. N. H. Patrick as manager, with the power given to the defendant to suspend and remove him, and to appoint another manager in his place, on consultation with the board of directors of the company, was an incident of the security to the defendant, and a means of having the operation of the mine continued until the debt to him should be discharged. Any new manager to be appointed was to have the rights, powers, and authority delegated to J. N. H. Patrick under the agree-

ment, and none others. The agreement did not in any manner make the defendant a partner with the company, or with J. N. H. Patrick, or make J. N. H. Patrick the agent of the defendant in managing the mine, so as to make the defendant responsible for any contract entered into by J. N. H. Patrick. The company continued to be the owner of the mine, operating it through J. N. H. Patrick, as its manager, agent, and attorney, and responsible for his contracts, as such."

It will be observed, as said by the counsel for the defendants in error, that the mining company was held as Patrick's principal, although Davis reserved the right to remove him. Here the bonding company possessed over Campbell all the power which both the mining company and Davis had over Patrick. Moreover, Patrick was a stranger to both the mining company and to Davis at the time of his appointment as manager of the mining company's property. In the case at bar Campbell was the general agent, manager, and resident secretary of the bonding company at the time of the execution of the bonds, and not only negotiated them, but himself drafted them.

The judgment is affirmed.