SOUTH ATLANTIC S. S. LINE v. LONDON–SAVANNAH NAVAL STORES CO.

(Circuit Court of Appeals, Fifth Circuit. October 24, 1918.)

No. 3241.

1. SHIPPING ☞108—CONTRACTS—BREACH.

Contract for freight room from United States to England, conditioned to be subject to provisions of ocean bill of lading, one of which was liberty to call at any port, in or out of customary route, was not breached by tender of ship "with the understanding that we reserve option of forwarding cargo via a continental port should it prove necessary," inserted in view of notice of shipper's claim that European war canceled all contracts for shipment to continental ports.

2. SHIPPING ☞108—CONTRACTS—PRIVILEGE OF CALLING AT PORTS.

Provision of contract for freight room that ship is to have liberty to call at ports in or out of customary route, in any order, to receive or

discharge cargo or passengers, or for any other purpose, is valid, so far as a stop is for a purpose proper or necessary to the voyage in which the ship is engaged.

**3. SHIPPING ☞108—CONTRACTS—CANCELLATION.**

Rejection by shipper of tender of ship, because of carrier's noncompliance with unwarranted demand that it forego a right reserved to it by contract for freight room, justified carrier in treating contract as canceled.

Appeal from the District Court of the United States for the Southern District of Georgia; Beverly D. Evans, Judge.

Libel in admiralty by the London-Savannah Naval Stores Company against the South Atlantic Steamship Line. From a judgment for libelant (248 Fed. 949), respondent appeals. Reversed.

Samuel B. Adams and A. Pratt Adams, both of Savannah, Ga., for appellant.

William Garrard, of Savannah, Ga., and J. Parker Kirlin, of New York City (John M. Woolsey, of New York City, on the brief), for appellee.

Before WALKER and BATTS, Circuit Judges, and SHEPPARD, District Judge.

WALKER, Circuit Judge. This was a libel in admiralty, filed by the appellee, London-Savannah Naval Stores Company, against the appellant, South Atlantic Steamship Line, to recover the damages claimed to have resulted from the alleged failure and refusal of the latter to tender vessels for the carriage from Pensacola, Fla., to Bristol, England, of certain rosin and turpentine, for which it had, by three written contracts with the appellee, agreed to furnish freight room, during the month of August, 1914. The parties will be referred to by the designations they had in the trial court—the libelant and the respondent, respectively. The contracts, dated respectively July 11, 1914, July 14, 1914, and July 27, 1914, were made by filling out and signing a form of an engagement for freight room so as to show the amounts of rosin and turpentine to be carried, the places of shipment and of destination, the freight to be charged, and the time within which the goods were to be delivered and received for shipment. On the back of each of the contracts were certain printed conditions, among which was the following:

"This contract is made upon the express condition that it is subject to all the clauses and conditions in the ocean bill of lading used by the vessel, which bill of lading is made a part of this contract and a copy of the same shall be furnished on application."

The libelant put in evidence the form of ocean bill of lading which was made a part of the contracts in question. The following is a copy of so much of this form as is material to be set out:

"Received for shipment from ———— in apparent good order and condition, to be transported by the steamship ———— from ———— to the port of ———— (or so near thereto as she may safely get), with liberty to call at any port or ports, in or out of the customary route, in any order whatsoever, to receive or

discharge coals, cargo, passengers, or for any other purpose, * * * and also subject to the clauses on the back hereof, which are mutually agreed to, and form a part of this bill of lading and contract as fully as if recited at length over the signature hereto affixed; and in accepting this bill of lading, shipper, owner, and consignee of the goods, and the holder of this bill of lading, agree to be bound by all the stipulations, exceptions and conditions expressed on the face and/or back hereof, whether written or printed, as fully as if they were all signed by such shipper, owner, consignee, or holder."

The above-quoted provisions were on the face of the form of bill of lading. On the back of it, after the words, "It is mutually agreed," was the following, among other provisions:

"Also that all goods destined for all points beyond Rotterdam or Antwerp are subject to all conditions, stipulations, and exceptions, expressed in the customary form of bill of lading, in use at the time of shipment by the carrier or carriers completing the transit."

Immediately succeeding the above quotation are the following statements in the summary of the evidence:

"The next clause is entitled 'London clause,' and refers only to the landing of goods and other immaterial matters. Except Rotterdam, Antwerp, and London, the form of ocean bill of lading does not mention any port."

On August 10, 1914, the respondent addressed the following two communications to the libelant:

"Gentlemen: Pensacola/Bristol: We herewith beg to tender you the s/s Twilight, now at Pensacola ready to load, under the above engagement, with the understanding that we reserve the option of forwarding this cargo via a continental port should it prove necessary. Kindly give your Pensacola office instructions to order this cargo out promptly, and oblige,

"Yours very truly,    .    South Atlantic Steamship Line."

"Gentlemen: Pensacola/London: We herewith beg to tender you the s/s Uganda, now at Sand Key awaiting orders, under the above engagement, with the understanding that we reserve the option of forwarding this cargo via a continental port should it prove necessary. Kindly give your Pensacola office instructions to order this cargo out promptly, and oblige,

"Yours very truly,    South Atlantic Steamship Line."

The contract referred to in the second of these two letters is not involved in this case. That letter is set out, so as to disclose all that was replied to by the following letter of the libelant of the same date, and addressed to the respondent:

"Dear Sirs: We have your letters of this date tendering us the steamers Uganda for London, and Twilight for Bristol, but beg to say that we cannot accept same with your reserving the option of forwarding these cargoes via a continental port. Such reservation is contrary to usance, besides which it is not provided for in your freight contracts with us and we must therefore insist upon your providing an unrestricted U. K. (meaning United Kingdom) voyage.

"Furthermore we would remind you that you agreed with our Mr. Jensen to give us one week's notice of steamers' readiness to load.

"Yours faithfully,    London-Savannah Naval Stores Co."

On August 11, 1914, the respondent wrote the following letter to the libelant:

"Gentlemen: Engagement 3000 B/Rosin and 3000 B/Turps. August shipment. Pensacola/Bristol: We are in due receipt of your yesterday's favor

notifying us that you decline to make delivery to the s/s Twilight under our contract with you, which gives us the option of forwarding direct or via a continental port. Under these circumstances we are compelled to look upon the contract as canceled, and are taking action accordingly, which please note.

"Very truly yours,                    South Atlantic Steamship Line."

And on August 12, 1914, the libelant addressed the following letter to the respondent:

"Dear Sirs: We are in receipt of your three favors of the 11th inst., and beg to repeat that we cannot permit shipment via a continental port, neither can we accept your notices and regard the freight contracts as canceled.

"Please let us know when you propose to lift the 250 brls. rosin contracted for August shipment to Liverpool at 15/—.

"Yours very truly,                    London-Savannah Naval Stores Co."

The evidence disclosed the following facts, about which there was no dispute: When the contracts were made it was understood that the naval stores in question would constitute only a part of the cargo of the vessel on which they would be shipped. It had been the almost unvarying practice of vessels carrying naval stores from Atlantic or Gulf ports to Bristol to carry also other goods consigned to a port or ports in Great Britain or on the continent of Europe, and to stop at such other port or ports before going to Bristol. It was not at all unusual for such vessels carrying naval stores shipped from Pensacola to Bristol to stop first at a continental port or a British port other than Bristol. The libelant had previously made shipments under similar contracts with the respondent on vessels which were to and did first stop at a continental port. The last shipment from Pensacola to Bristol made by the libelant over the respondent's line went by Rotterdam to Bristol under the same kind of contract. The war in Europe having started after the contracts were made, the libelant put the respondent on notice that it considered all its continental contracts canceled on account of the war and that the United Kingdom contracts were still in force. The letters quoted were written after this occurred. The respondent had contracted to furnish freight room for goods to be shipped in August to both Antwerp and Rotterdam, to meet which obligations it expected to use the Twilight, if the shippers were prepared to ship and called for the fulfillment of their contracts. It was under these circumstances that the respondent's letters of August 10th were written.

The libelant's manager, who conducted its part of the above-quoted correspondence, was a witness in its behalf. He admitted that if there had been no such correspondence or communications, and the respondent had received the rosin and turpentine as provided in the contracts, and had issued its bills of lading therefor as contemplated by the contracts, it would not have been inconsistent with the contracts, or with the understanding of the parties when the contracts were made, for the ship carrying the goods to carry other goods destined to a continental port or ports and to stop at such port or ports before going to Bristol.

[1] We understand a contention made in behalf of the libelant to be that it was justified in declining the tender of the ship Twilight, made by the respondent's letter of August 10th, because that tender

had a condition attached which the respondent had no right to impose, and that the libelant's acceptance of that tender would have effected a change of its rights under the contracts. Nothing in either of the respondent's letters indicated a purpose on its part to do anything which under its contracts it was not at liberty to do. The libelant's reply of August 10th showed that it insisted on the respondent "providing an unrestricted U. K. voyage." Its letter of August 12th explicitly states that "we cannot permit shipment via a continental port."

Instead of the correspondence showing an attempt by the respondent to impose a condition inconsistent with its contracts, it shows an explicit refusal by the libelant to make use of the tendered freight room for which it had contracted unless the respondent would furnish a ship for a voyage different from the one contemplated by both parties when the contracts were made, and that it would not permit the goods to be shipped on a vessel which was to go "via a continental port," though under the contracts there was a right to carry cargo destined to, and to stop at, a continental port before the vessel reached Bristol. The respondent having been put on notice that the libelant considered that the existence of the European war had the effect of canceling all contracts for the shipment of goods to ports on the continent of Europe, its letters of August 10th served the purpose of informing the libelant that the respondent did not concur in that view, and that it did not surrender the option which it claimed its contracts gave it of forwarding libelant's goods via a continental port. If the respondent had remained silent under the circumstances, it was possible for the delivery of its goods for shipment by the libelant to be influenced by the inference or assumption that the respondent acquiesced in the former's view as to the effect on the contracts in question of the existence of war in Europe. In view of what had occurred, the letters amounted to a reasonable precaution to avoid the delivery and receipt of the goods under a misunderstanding as to the voyage being or not being such a one as was contemplated when the contracts were made.

[2, 3] As shown by the terms of the bill of lading stipulated for, the vessel carrying the libelant's rosin and turpentine was to have—

"liberty to call at any port or ports, in or out of the customary route, in any order whatsoever, to receive or discharge coals, cargo, passengers, or for any other purpose."

There is no law standing in the way of a shipper under a maritime contract binding himself by an agreement that the vessel carrying his goods, constituting only a part of its cargo, is to have the privilege expressed by the provision just quoted. No right of a shipper under such a contract is violated by the vessel carrying his goods going to the port to which they are destined by way of another port, in or out of the customary route, for the delivery of other goods shipped to such other port. Austrian Union Steamship Co. v. Calafiore, 194 Fed. 377, 114 C. C. A. 295, was a case of a shipment under a bill of lading containing a provision quite similar to the one above quoted. In the opinion of this court rendered in that case it was recog-

nized that the stopping of the vessel at another port before reaching that to which the complaining shipper's goods were destined could not have justified the complaint made, but for the fact that the stop which was made was for a purpose not proper or necessary to the voyage in which the ship was engaged.

In the instant case it was not indicated by the tender made or otherwise that the vessel tendered would stop anywhere or do anything not proper and necessary to such a voyage as was in the contemplation of the parties when the contracts were made. The shipper's acceptance of the tender would not have involved the loss of any right to which its contracts entitled it. The contracts did not entitle the libelant to demand the furnishing of the freight room contracted for, with the condition added that the voyage of the vessel tendered be different from the one contemplated by both parties when the contracts were made. All that libelant was entitled to was performance of the contracts. Its rejection of the tender because of the respondent's noncompliance with an unwarranted demand that it forego the right which the contracts reserved to it of going to Bristol by way of a continental port justified the respondent in treating the contracts as canceled.

It follows that the decree appealed from cannot be sustained. It is reversed.