### DIETRICH v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(Circuit Court of Appeals, Second Circuit. August 10, 1925.)

No. 164.

1. **Principal and agent ⬥129, 136(2)—Agent's contract on behalf of principal is contract of principal, enforceable by and binding on him.**

Contract of agent within his actual or apparent authority on behalf of principal is contract of principal, which can neither be enforced by nor is binding on agent.

2. **Principal and agent ⬥136(1), 190(1)— Agent may bind himself by contract on behalf of principal; presumption is that contract was principal's.**

Agent may bind himself by contract, notwithstanding it discloses name of principal; but presumption is that contract was that of principal, and not of agent.

3. **Shipping ⬥106—Emergency Fleet Corporation held liable on bill of lading issued by agent company.**

Contract between steamship company and United States, acting through Shipping Board,

represented by Emergency Fleet Corporation, for operation of vessels by company, *held* to impose contractual obligations on Fleet Corporation, such that it could be held liable on bill of lading issued by company as its agent.

**4. Principal and agent ⊕═99—Principal liable to third persons for acts of agent within apparent or actual scope of authority.**

Principal is liable to third persons for all acts of agent in his behalf in the course and within the actual or apparent scope of his agency.

**5. Principal and agent ⊕═145(4)—One contracting with agent of undisclosed principal may proceed against him.**

One contracting with agent of undisclosed principal may maintain action against principal for acts of agent within scope of his authority and course of his employment, or may, at his election, sue agent.

**6. Shipping ⊕═106—Bill of lading is binding on shipper, though not signed by him, if accepted without objection, in absence of fraud.**

Contract between ship and shipper is found in bill of lading, which is binding on shipper, although not signed by him, if accepted by him without objection, and in absence of fraud.

**7. Shipping ⊕═118—Shipper may claim damages for unreasonable delay in sailing, in absence of contrary agreement.**

In absence of any agreement to contrary, shipper may claim damages if ship delays unreasonably or beyond agreed time, if any, in sailing.

**8. Contracts ⊕═212(1)—What constitutes "reasonable time" for performance of act under contract stated.**

"Reasonable time" for performance of acts under a contract is such time as would suffice for their performance, if the one whose duty it is to perform used diligence and prudence of an ordinary person under like circumstances.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reasonable Time.]

**9. Shipping ⊕═118—In absence of contrary agreement, voyage must be commenced and prosecuted without unnecessary delay or deviation.**

In absence of agreement to contrary, ship's voyage must be commenced without needless delay, and prosecuted without unnecessary delay or deviation.

**10. Shipping ⊕═141(1)—Bill of lading, if valid, held to relieve shipowner from liability for delay.**

Bill of lading permitting deviations, changes of route, etc., *held*, if valid, to relieve owner from liability for delay in transportation of shipment of flour.

**11. Shipping ⊕═140—Bill of lading, relieving shipowner from liability for negligence, void as against public policy.**

Bill of lading relieving shipowner from liability for negligence of carrier or his servants is contrary to public policy and void, in view of Harter Act, §§ 1, 2 (Comp. St. §§ 8029, 8030).

**12. Shipping ⊕═106—Bill of lading, reserving broad rights in matter of deviation and delay, held not void, as against public policy.**

Bill of lading, giving ship right to delay or deviate from intended route, *held* not void, as against public policy; it being construed as restricted to delays fairly ancillary to voyage.

**13. Courts ⊕═352—Refusal to permit plaintiff to reopen case for additional proof, after he had rested and complaint had been dismissed, held not error.**

Refusal to permit plaintiff, after he had rested, and complaint had been dismissed for want of proof of relation between steamship company issuing bill of lading and defendant Emergency Fleet Corporation, to reopen case, *held* not error, notwithstanding New York Rules of Civil Practice, No. 166.

**14. Appeal and error ⊕═966(1)—Continuance ⊕═13, 17—Continuance unwarranted for mistake of law or to permit litigant to get better proof; discretion reviewable only for abuse.**

Matter of continuance or postponing case rests in court's discretion, whose action is reviewable only for an abuse, though litigant is not entitled to continuance because he discovers he has made a mistake of law, or for purpose of getting better proof.

**15. Continuance ⊕═44—Facts on which application for continuance based should be verified by affidavit.**

Generally facts on which application for continuance is based must be verified by affidavit, unless they are within judicial knowledge of court, and not open to dispute.

**16. Appeal and error ⊕═1047(4)—Judgment not reversed when fatal defect in proof could not be cured.**

Judgment will not be reversed for refusal to permit plaintiff to reopen case to show relation between defendant and company issuing bill of lading, where delay in delivery complained of was not breach of bill of lading, as this fatal defect would not have been cured.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Dallas W. Dietrich, doing business as the Atlantic Seaboard Flour Mills, against the United States Shipping Board Emergency Fleet Corporation. Judgment dismissing complaint, and plaintiff brings error. Affirmed.

The plaintiff commenced this suit in the Supreme Court, county of Richmond, state of New York. The defendant removed the suit to the United States District Court for the Eastern District of New York. This it did on the ground that the action was one arising under a law of the United States, inasmuch as the defendant was incorporated under an act of Congress.

The complaint alleged that defendant is

and was doing business as a common carrier of goods for hire, and as such was the owner and operator of the steamship Panola; that on August 31, 1921, at Philadelphia, Pa., plaintiff delivered to defendant certain goods, wares, and merchandise, to wit 2,014 sacks of flour, in good order and condition, the same being the property of the plaintiff. It also alleged that, in consideration of freight charges then paid to it by plaintiff, defendant agreed to safely carry said property to Helsingfors, Finland, by the steamship Panola, with reasonable dispatch, and there safely to deliver the same to plaintiff or his order, and defendant represented that said steamship Panola would sail from Philadelphia, Pa., on or about September 5, 1921, on the voyage aforesaid, and defendant at the time and place aforesaid received same upon the agreement and for the purpose aforesaid. It further alleged that defendant did not carry and deliver said property with reasonable dispatch, but, on the contrary, negligently and wrongfully delayed said carriage; that said steamship Panola sailed from Philadelphia, Pa., on or about September 8, 1921, and wrongfully deviated from said voyage, contrary to the agreement aforesaid, by proceeding first to and remaining an unreasonable length of time, to wit, until September 30, 1921, at the port of New York, and thereafter by returning to the port of Philadelphia, Pa., and remaining at said port until on or about October 5, 1921, and so negligently and wrongfully prolonged the duration of the voyage as to cause injury and damage to plaintiff, through depreciation in value and loss of market. It concluded that, by reason of the aforesaid acts of defendant, plaintiff has been damaged in the sum of $3,767.60, no part of which has been paid, although due demand has been made therefor.

A jury was impaneled and sworn. The plaintiff put in his case and rested. Thereupon counsel moved to dismiss the complaint, on the ground that the plaintiff had failed to establish any privity of contract between the plaintiff and the defendant, and had entirely failed to make out a prima facie case against the defendant, the United States Shipping Board Emergency Fleet Corporation.

Counsel on each side were heard on this motion and then the court said: "I grant the motion, because I do not recall any evidence in this case which authorizes an exception to the rule the ship and the owner are liable to the third person, who is sued here, who is not the owner; that is, the Shipping Board, the Emergency Fleet Corporation. Of course, if you have anything to the contrary, I will hear you on a motion to set aside the ruling."

Then the following colloquy occurred:

"Mr. Cullom: Before you make that ruling, I would like to request an opportunity to place under subpœna the officers of the Shipping Board with respect to the conduct of this boat. I have tried myself my best to get them and failed. I think between now and to-morrow—I do not know who can do that.

"The Court: Here is the difficulty about that. If you had not closed your case, and you had asked for that rule, I would undoubtedly have granted it. I saw the position you were in, but when you make what you conceive to be a prima facie case, and you close, I do not think it is exactly fair on my part, after I rule, to let you speculate, and then open again. For that reason I decline to do that. If you had asked it before you closed, I would have given you an opportunity to do it; but I think I ought to be fair to both sides, and when a man closes a case, knowing the question he is up against, he has got to take a chance.

"Mr. Cullom: Under our Civil Practice Act here the courts hold that the order of proof is strictly in the discretion of the court, and I thought I had adduced proof, I am frank to say, which was satisfactory to the court that the Shipping Board's inference in this situation was such as to authorize a judgment for plaintiff. Now, then, if I am wrong in that, what injury can be done to substantial justice to permit me to bring out all the facts I can. If I cannot produce that proof, your honor's ruling has to stand; instead of my having to wait another year on the calendar to try to get in a position to produce that proof, I thought your honor might let me do that tomorrow morning. * * *

"Mr. Cullom: What harm can be done to the defendant, your honor?

"The Court: If you put it on that proposition, when would you get through?

"Mr. Cullom: To-morrow morning at a quarter past 10.

"The Court: If you took this position immediately, you can see I do not mean you would; but it would be open to you to say, 'I would like to offer something else.' That is the difficulty. I do not feel, sir, under the circumstances, that it is right for the judge to do that. * * *

"Mr. Cullom: I respectfully except to the court's refusal to permit me to offer proof which I believe I can obtain by the

opening of the court to-morrow morning with respect to the operation and control of this ship by the Shipping Board. I further except to the court's ruling dismissing the complaint.

"The Court: Yes; I will give you an exception."

The court then adjourned, with the understanding that the matter would be further considered the next morning. At that time counsel for plaintiff said:

"May it please your honor, I now wish to move to withdraw a juror, or for leave to reopen my case, or for an adjournment for the purpose of obtaining further proof on the following grounds: Through inadvertence on my part yesterday I failed to do that which I had intended to do, namely, to introduce in evidence the original answers of this defendant, which admit that this defendant received the merchandise and agreed to transport it to its destination, and that it was the contracting party. Now, by court order that answer has been amended, and I concede, of course, that the amended answer supersedes the original answer, notwithstanding it is the law that that answer may be received in evidence as an admission; not as the pleading in the case, but as an admission. I had that paper in my files here yesterday, and had intended to introduce it, and neglected to do so through an oversight.

"Now, the second ground upon which I urge your honor to grant this motion is this: I had endeavored to obtain by every means at my command the documentary evidence in this case, the financial relation, or rather the orders and directions that were given pursuant to the contract MO–4, and I believed until 4 o'clock yesterday afternoon that the defendant would produce those documents. I was surprised, and am now surprised, that they have been withheld. Now, I submit that, after all, what we want to do in this case is to obtain the final adjudication on the merits, and not a dismissal by reason of failure of proof. The law in this state on this question is thus stated in rule 166 of subdivision 2 of our Civil Practice Act: 'A complaint or counterclaim may not be dismissed on the trial because of failure or deficiency in proof. If it shall be made to appear that the evidence to supply the defect can be produced, the judge may thereupon receive such evidence or adjourn the trial, or direct a new trial upon such terms as in his discretion shall be proper.'

"Now, if your honor please, the courts of our state have uniformly held that if there is

surprise, or if through oversight or neglect the case is not before the court and jury, so that there can be final adjudication on the merits, that the court should be lenient with respect to affording an opportunity to adduce that proof. I particularly invite your attention to a very late case, a unanimous decision of our Appellate Division, First Department, in Stern v. Gage, 196 App. Div. 339, 187 N. Y. S. 580, where a defendant relied upon an admission in answer to supply a certain defect in his proof. He went to trial, the court ruled against him, and said that the admission in the answer did not supply the defect. He requested a short adjournment for the purpose of adducing the proof, and the court ruled, just as it has been intimated here that possibly your honor may rule, that, inasmuch as we have answered 'Ready,' we should not be permitted to have any leeway with respect to the evidence that we can get, and the court said, 'We are of the opinion that in the circumstances the court should have granted the indulgence with respect to a short adjournment.' * * *

"Mr. Cullom: I beg your honor's pardon. The party had rested in this case.

"The Court: Well, you did not state so.

"Mr. Cullom: Yes, sir; he had rested, and may I just for one moment invite your attention to the practical aspects of this ruling?

"The Court: Yes.

"Mr. Cullom: If the ruling stands, and we are not permitted to adduce proof that we can get, and I state to your honor, as an officer of this court, that it is my absolute sincere conviction that I can obtain the necessary proof to meet your honor's requirements, with respect to the collusion that existed between these two parties—now, assume that we are not given that opportunity. What is the practical result? Out of deference to my client's interest, I must, of course, take an appeal from this ruling.

"The Court: You could do either one of two things. My understanding is, of course, that you could stand on your contention and take an appeal, or you could take a nonsuit, because you have the right to take a nonsuit, which would put you back where you could bring a new suit, which would practically put you where you would be if I were to grant your motion, because under your authority it is a question of what time the court should require, which would put you in just the same fix.

"Mr. Cullom: Except for this, there are

limitations in the bill of lading within which time to bring suit.

"The Court: There are limits which apply under the bills of lading?

"Mr. Cullom: Yes, sir.

"The Court: Is that time passed?

"Mr. Cullom: Yes sir. Here is what I would respectfully urge your honor to do: If your honor still feels there is not sufficient proof in this case, tax the costs against me, and I agree to pay them within 24 hours. Leave the case on the calendar, or put it back on the calendar for any date, any further date your honor may permit, before either your honor or before any other judge, or adjourn it a month, and still permit me to pay the costs. * * *

"Mr. Cullom: I am perfectly willing to try this case before your honor, and I am willing to go to trial next Monday, or any other time. Now, your honor, is not a lawsuit a fair struggle for a just decision, and not a contest of wits?

"The Court: That is exactly my view, sir, and I always try cases on that idea, and I am very liberal in letting evidence in. If I am asked to decide, I rule what the law is; but I always let the evidence in, because of that very rule.

"Mr. Cullom: Now, let us consider the aspect of the case mentioned, assuming you discuss the cases together.

"The Court: You need not discuss that case. You have already shown me enough.

"Mr. Cullom: Cannot the defendant on an adjourned date, at any time he may elect, go forward with the suit, and be prepared then to meet the issue? I state to him that I am going to adduce the proof, and, if I cannot produce it in New York, I am going to take the depositions of his own officers in Washington to get it. He knows exactly what the issue will be here, and he can produce his evidence to rebut it. * * *

"Mr. Cullom: That is not a dismissal on the merits, your honor?

"The Court: Oh, no; I am not passing on the merits at all. I am passing on the fact that you did not make sufficient proof. I do not undertake to pass on the merits at all, because I did not have that before me."

The complaint having been dismissed, the case is brought here by writ of error.

Neil P. Cullom, of New York City, for plaintiff in error.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Edgar C. Wandless, of New York City, Franklin W. Morton, of Brooklyn, N. Y., and Charles E. Wythe, of New York City, Sp. Asst. U. S. Attys., of counsel), for defendant in error.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is an action brought to recover damages alleged to have been sustained by plaintiff by reason of depreciation in value and loss of market of a shipment of flour laden on board the steamship Panola, due to delay in delivery at the port of destination. It is alleged in the complaint that the plaintiff delivered on August 31, 1921, to defendant, a common carrier, certain sacks of flour in good order and condition; that the flour was to be carried by the steamship Panola from Philadelphia, Pa., to Helsingfors, Finland; that defendant represented that the steamship would sail from Philadelphia on or about September 5, 1921, and would carry the flour with reasonable dispatch, and safely deliver the same to plaintiff or its order; that it did not carry and deliver the same with reasonable dispatch, but contrary to its agreement deviated from its voyage by first proceeding to the port of New York, where it remained until September 30, 1921, and then returned to Philadelphia and remained there until October 5, 1921; and that it so negligently and wrongfully prolonged the duration of the voyage as to cause injury and damage to plaintiff through depreciation in value and loss of market.

The original answer, duly verified by defendant's agent, admitted the delivery by plaintiff to defendant of the merchandise in question and defendant's agreement to carry said property to destination with reasonable dispatch, and there to deliver same as consigned; otherwise, the answer was a general denial. It was filed on May 3, 1923; but on August 3, 1923, defendant amended its answer, and denied the facts it had admitted in the original answer, along with the remaining allegations of the complaint.

On the trial plaintiff produced the bills of lading issued by the Susquehanna Steamship Company. It then offered in evidence the operating agreement under which the Susquehanna Steamship Company operated the steamship Panola for defendant's account, which agreement, it was conceded, was in force and effect during all the times involved herein. It was also conceded that the steamship Panola was one of the vessels assigned to the Susquehanna Steamship Company under the operating

agreement. It was stipulated on the trial that the Panola, after receiving plaintiff's merchandise on board, instead of proceeding to her port of destination—Helsingfors, Finland—remained from August 31, 1921, to September 8, 1921, at Philadelphia, when she sailed to New York, and there remained until September 30, 1921, returned to Philadelphia on or about said date, and remained there until October 5, 1921, on which latter date she proceeded to her destination, where she arrived on November 15, 1921.

The general freight agent of the Susquehanna Steamship Company testified that he was thoroughly familiar with the facts and circumstances surrounding the operation of the ship in question, that "the steamship Panola was operated under what is known as the MO–4 agreement. Under the MO–4 agreement the Shipping Board was fully advised as to just what we were doing, and they were at all times kept posted." The witness further testified as follows:

"Her stay at New York was due to the fact that at that particular time there was one of the Shipping Board operators eliminated from the Scandinavian territory, and there was a general mix-up of cargo, and a rehandling of cargo there between the operators.

"Q. Prior to this time, is it a fact that the Shipping Board had two lines to the Baltic ports? A. Three.

"Q. What were they? A. Moore & McCormack, the Susquehanna Steamship Company, and the Seager Steamship Company.

"Q. You stated a moment ago, I believe, that this detention at New York was due to the fact of the elimination of one of those lines by the Shipping Board. Is that correct? A. Yes, sir.

"Q. Which line was eliminated by the Shipping Board? A. The Seager Steamship Company."

The witness further testified that the Susquehanna Company rendered daily written reports to defendant of the operation of the ship, but defendant refused upon demand to produce these reports. Defendant's traffic department had full control of the movements of the ships.

Plaintiff's export manager, John W. Craig, testified that the normal running time between Philadelphia and Helsingfors at this time was from 21 to 26 days, and that the difference between the market values on the date when the ship should have arrived and the date of actual arrival, with interest, was $4,238.15. The witness further testified

that he had not been advised by defendant or any of its representatives of the proposed delay in the ship's departure, and that the movements of this particular vessel were "quite unusual."

Plaintiff rested, and defendant moved to dismiss the complaint, on the ground that there was no "privity of contract between plaintiff and defendant." The court granted the motion over plaintiff's exception, on the ground that the ship and the owner would be liable to plaintiff, but that defendant in the case at bar was not, and owed no duty or obligation to plaintiff.

The complaint was dismissed because th.. plaintiff had failed to establish any liability on the part of the defendant. The action was brought solely against the United States Shipping Board Emergency Fleet Corporation. The plaintiff introduced in evidence an agreement dated January 4, 1921, and which is known as "the MO–4 agreement." This agreement is thus entitled:

"United States Shipping Board,

"Represented by United States Shipping Board Emergency Fleet Corporation, Washington."

It then states:

"This agreement, made in duplicate the 4th day of January, 1921, between the United States of America, acting through the United States Shipping Board, represented by the United States Shipping Board Emergency Fleet Corporation, hereinafter called the corporation, and Susquehanna Steamship Company, hereinafter called the agent."

At the conclusion of the agreement it is recited as follows:

"In witness whereof, the parties hereto have executed this contract, in duplicate, the day and year first above written. United States of America, by United States Shipping Board, by United States Shipping Board Emergency Fleet Corporation, by [Signed] W. S. Benson, President. Attest: [Signed] John J. Flaherty, Secretary. Susquehanna Steamship Co., Inc., [Signed] Jos. D. Phillips, Vice Prest., by [Signed] Joseph G. Stockham, Secretary, Agent."

It is apparent that the United States of America and the Susquehanna Steamship Company are parties to this contract. We also think it apparent that the intention was that the United States Shipping Board, the Emergency Fleet Corporation were also intended to be parties.

In Sloan Shipyards Corporation v. United

States Shipping Board Emergency Fleet Corporation, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762, an action was brought against the defendant in the present suit, and as in this case the action was based on an alleged breach of contract. In that case the contract was made with the Fleet Corporation, "representing the United States of America." The Supreme Court, in holding that the action could be maintained against the Fleet Corporation, said: "We attach no importance to the fact that the second contract, alleged to have been illegally extorted, was made with the Fleet Corporation 'representing the United States of America.' The Fleet Corporation was the contractor, even if the added words had any secondary effect." And the court held that the Fleet Corporation, notwithstanding the enormous powers which had been given to it, was not so far put in place of the sovereign as to share the immunity of the sovereign from suit, otherwise than as the sovereign allowed.

[1] It is a general principle of law that, if an agent acts within the scope of his actual or apparent authority and enters into a contract on behalf of his principal, the contract is that of the latter. All the rights and obligations which arise under it are those of the principal, and the agent cannot enforce the contract, neither is he bound by it. Williston on Contracts, vol. 1, § 281.

[2] While the general rule is as above stated, it is possible for the agent to bind himself by the contract, although the contract discloses the name of his principal. If the name of the principal is disclosed, there is a strong presumption that the contract was intended to be that of the principal, and not that of the agent. But the rule is simply one of presumption. Williston on Contracts, supra. In Whitney v. Wyman, 101 U. S. 392, 396 (25 L. Ed. 1050), the court said:

"As the meaning of the lawmakers is the law, so the meaning of the contracting parties is the agreement. Words are merely the symbols they employ to manifest their purpose, that it may be carried into execution. If the contract be unsealed and the meaning clear, it matters not how it is phrased, nor how it is signed, whether by the agent for the principal, or with the name of the principal by the agent, or otherwise. The intent developed is alone material, and when that is ascertained it is conclusive. Where the principal is disclosed, and the agent is known to be acting as such, the latter cannot be made personally liable, unless he agreed to be so."

[3] If the meaning of the contracting parties is the agreement, and it matters not how it is phrased or how it is signed, and the intent developed is alone material, it is not difficult to hold that under this agreement the defendant herein assumed contractual obligations. The agreement made the Susquehanna Steamship Company the agent of the defendant, and the defendant agreed to pay its agent full compensation for its services under the contract. The right to terminate the agreement at any time was vested in defendant, and the agent's right to terminate it was conditioned on giving 30 days' written notice to the defendant; and the agreement was made retroactive, "except as may be otherwise mutually agreed by" the defendant and the other party to the contract, the Susquehanna Steamship Company. The agreement appointed that company as the agent of the defendant, with power to "manage, operate, and conduct the business of such vessels as it [defendant] has assigned or may assign to" the agent; and the business of such vessels was to be managed, operated, and conducted in accordance "with the directions, orders, and regulations which" the defendant from time to time prescribed.

[4] Under the language of the agreement we have no difficulty in finding that the agreement imposed contractual obligations upon the defendant, and that an action may be maintained against it as the principal on contracts made by its agent, the Susquehanna Steamship Company. Where the relation of agency legally exists, the principal will be liable to third persons for all acts committed by the agent in his behalf, in the course and within the actual or apparent scope of his agency. King v. Lamborn, 186 F. 21, 29, 108 C. C. A. 123; Mather v. Barnes (C. C.) 146 F. 1000, 1015; American Bonding, etc., Co. v. Takahashi, 111 F. 125, 49 C. C. A. 267.

[5] No principle of the law is more thoroughly established than that an agent, who enters into contractual relations on behalf of an undisclosed principal, binds the principal, and an action can be maintained against the latter for acts done by the agent within the scope of his authority and in the course of his employment. In such cases the person with whom the contract has been made may sue either the agent or his principal as he may elect. In Mechem on Agency (2d Ed.) vol. 2, § 1731, after discussing certain objections, the author states the rule as follows:

"Notwithstanding these objections, the considerations making for the principal's liability have generally prevailed under English law, though not under the continental

systems, and it is unquestionably the general rule of our law that an undisclosed principal, when subsequently discovered, may, at the election of the other party, if exercised within a reasonable time, be held liable upon all simple nonnegotiable contracts made in his behalf by his duly authorized agent, although the contract was originally made with the agent in entire ignorance of the principal. The rule applies, not only where the principal has in fact received the benefits of the contract, but also where the contract still remains executory. The rule itself is doubtless an anomaly, but even so it is undoubtedly as well settled as any other rule in the law of agency."

And there is no question that the rule as above stated is the law of the federal courts. Ford v. Williams, 21 How. 287, 16 L. Ed. 36; Berry v. Chase, 179 F. 426, 102 C. C. A. 572; Prichard v. Budd, 76 F. 710, 22 C. C. A. 504; Pope v. Meadow Spring Distilling Co. (C. C.) 20 F. 35. In Vital v. Kerr (C. C. A.) 297 F. 959, 969, we had occasion to say that: "It is quite true that, where an agent makes a contract for an undisclosed principal, a right of action exists against the principal, although the latter's name in no way appears upon the face of the contract. While the rule of the common law is that an action can be brought upon a sealed contract only against those whose names appear therein, it is equally well established that, if the contract is not under seal, the undisclosed principal is liable, whether the contract is in writing or merely oral. Ford v. Williams, 21 How. 287, 16 L. Ed. 36. But in all such cases the fact of the agency must be shown by satisfactory evidence."

So in Moore v. Sun Printing & Publishing Association, 101 F. 591, 41 C. C. A. 506, this court said: "As the defendant was the real principal, the libelant was entitled to enforce the contract against it, notwithstanding it purported to be a contract of the agent. Steamship Co. v. Harbison, 21 Blatchf. 332, 336, 16 F. 688."

The Susquehanna Steamship Company, as the agent of this defendant, operated the steamship Panola in accordance with the directions, orders, and regulations which defendant prescribed, and in such service as defendant directed, and it was expressly agreed that the steamship company might issue to shippers "the customary charter parties, freight contracts, and bills of lading except as otherwise prescribed by the defendant, and in pursuance of the authority thus expressly conferred upon it bills of lading were issued by it to the plaintiff at

Philadelphia on August 31, 1921, and if valid bills of lading were rightfully issued to plaintiff, and wrongfully breached by the agent, the plaintiff could maintain an action against the defendant—the defendant being the principal for which the agent acted and by which it was empowered to operate the vessel.

In this case the flour was delivered to the Susquehanna Steamship Company in New York on August 31, 1921, and the bills of lading are dated on that day. They stated that the goods were to be shipped on the Panola and that their destination was Helsingfors, Finland. At that time it was expected the ship would begin its voyage on or about September 5, 1921. But, instead of starting on its European voyage, it started for New York City on September 8, and remained there until September 30, 1921, when it returned to Philadelphia where it remained until October 5, 1921. It arrived abroad about November 18, 1921, and on her arrival the buyer of the flour refused to accept it on account of the delay in making delivery, the value of the flour having depreciated in the meanwhile, whereby the plaintiff claims he was damaged to the amount of $3,767.60. Is the plaintiff, under the circumstances, entitled to recover? The court below thought not.

This brings us to the consideration of the bills of lading. In Crooks v. Allan, L. R. 5 Q. B. Div. 38, 40, Lush, J., said: "A bill of lading is not the contract, but only the evidence of the contract; and it does not follow that a person who accepts the bill of lading which the shipowner hands him, necessarily and without regard to circumstances, binds himself to abide by all its stipulations. If a shipper of goods is not aware when he ships them, or is not informed in the course of the shipment, that the bill of lading which will be tendered to him will contain such a clause, he has a right to suppose that his goods are received on the usual terms, and to require a bill of lading which shall express those terms."

But in the present case there is nothing in this record to show that the shipper of these goods did not know the contents of the bills of lading when he accepted them, or that he was misled in any way concerning any of the conditions contained in them. In Leduc v. Ward, 20 Q. B. D. 475, 6 Asp. Mar. L. Cas. 290, Lord Esher said: "If the bill of lading is wrong as to the goods put on board, its effect is destroyed for any other purpose. But, if the goods have been received on board, the bill of lading is more than a receipt; it is a contract of carriage."

[6] The contract between a ship and the shipper is found in the bills of lading delivered to the shipper. They constitute the contract and bind the shipper, although not signed by him, if delivered to and accepted by him without objection, and in the absence of fraud. American Railway Express Co. v. Lindenburg, 260 U. S. 584, 591, 43 S. Ct. 206, 67 L. Ed. 414; The Henry B. Hyde (D. C.) 82 F. 681, 683; In the Matter of Bills of Lading, 52 Interst. Com. Com'n R. 671, 681. In McMillan v. Michigan Southern, etc., R. R. Co., 16 Mich. 79, 113 (93 Am. Dec. 208) Mr. Justice Cooley said:

"A bill of lading proper is the written acknowledgment of the master of a vessel that he has received specified goods from the shipper, to be conveyed on the terms therein expressed to their destination, and there delivered to the parties therein designated. Abbott on Shipping, 322. It constitutes the contract between the parties in respect to the transportation, and is the measure of their rights and liabilities, unless where fraud or mistake can be shown. * * * Bills of lading are signed by the carrier only; and where a contract is to be signed only by one party, the evidence of assent to its terms by the other party consists usually in his receiving and acting upon it. This is the case with deeds poll, and with various classes of familiar contracts, and the evidence of assent derived from the acceptance of the contract, without objection, is commonly conclusive. I do not perceive that bills of lading stand upon any different footing."

In Glyn v. East & West India Dock Co. (1882) 7 A. C. 591, 596, Lord Selborne said: "The primary office and purpose of a bill of lading, although by mercantile law and usage it is a symbol of the right of property in the goods, is to express the terms of the contract between the shipper and the shipowner."

In the Supreme Court, in The Delaware, 14 Wall. 579, 20 L. Ed. 779, it was held that the bill of lading imported a contract and that evidence to vary it ought not to be admitted. And Carver on Carriage of Goods by Sea (6th Ed.) § 50, speaking of a bill of lading, states that it "sets out the fact that the goods have been shipped and the terms upon which they are to be carried and delivered."

[7] In the absence of any agreement to the contrary, a shipper may claim damages if the ship delays unreasonably in sailing, or beyond the agreed time, if any; and, in the absence of agreement to the contrary, delivery of goods shipped must be made within a reasonable time. Fowler v. Knoop, 4 Q. B. D. 299; Hostetter v. Park, 137 U. S. 30, 11 S. Ct. 1, 34 L. Ed. 568; The Gordon Campbell (D. C.) 141 F. 435; The Prussia (D. C.) 100 F. 484. In Carver on Carriage of Goods by Sea (6th Ed.) § 179, it is said:

"So far as the contract is express on any point, rules which would otherwise apply as to implying terms on that point have no operation, and no term can be implied which is not consistent with those that are expressed. But, apart from these considerations, one general rule may be said to govern the performance of the contract, viz. that it must be performed in a reasonable manner and with reasonable diligence on each side. Where the manner or place of doing an act, or the time at which or within which it is to be done, is left undefined, it is to be determined by reference to what is reasonable, having regard to the circumstances of the particular case."

The bills of lading were issued by and in the sole name of the Susquehanna Steamship Company. They make no reference to this defendant or to the United States. They contain the following statement:

"It is mutually agreed that the goods are to be carried under the following exceptions and conditions, which shall govern the relations between the shipper consignee and shipowner in every possible contingency, whenever occurring and even in the event of deviation or unseaworthiness of the vessel at the inception of the voyage or subsequently:

"(1) * * * The vessel with the goods on board, either before or after proceeding toward the port of discharge, may remain in port, proceed by any route, and deviate from or change the advertised and intended route at any stage of the voyage, and may proceed to and stay at any places whatsoever, although in a contrary direction to, or outside of, or beyond the usual route to the said port of discharge once or oftener, in any order, backwards or forwards, for loading and/or discharging cargo, fuel, stores, or passengers, and/or for any purpose whatsoever, that in the opinion of the shipowner or master may seem advisable. This liberty is not to be considered as restricted by any words of this contract whether written, stamped or printed."

[8] In Co. Litt. 50, it is said: "Quam longum debet esse rationabile tempus non definitur in lege, sed pendent ex discretione justiciariorum." And the courts have laid down the rule that "reasonable time" for the performance of acts under a contract is such a period of time as suffices for their performance, if the one whose duty it is to perform

uses such diligence in the performance as a person of ordinary diligence and prudence would use under like circumstances. See Frech v. Lewis, 218 Pa. 141, 67 A. 45, 11 L. R. A. (N. S.) 948, 120 Am. St. Rep. 864, 11 Ann. Cas. 545; Hollis v. Libby, 101 Me. 302, 64 A. 621; Alexander v. Atlantic Coast Line R. Co., 144 N. C. 93, 56 S. E. 697; Stone & Co. v. Atlantic Coast Line R. Co., 144 N. C. 220, 56 S. E. 932.

[9] In the absence of some agreement to the contrary, a voyage must be commenced without needless delay, and must be prosecuted without unnecessary delay or deviation. The shipowner's agreement is that he will be diligent in transporting the goods to their destination, and that he will do so without unnecessary deviation. And there can be no doubt that, if the cargo which was to be carried to Finland by the Panola had not been received under such a contract as is disclosed in this record, and which gives a wide liberty to do things which otherwise would be deviations from the voyage, a liability on the part of the shipowner for such delays as occurred in this case could not be successfully controverted. It seem to us equally plain that, under the bills of lading issued and accepted without protest in this case and the wide liberty contracted for, the shipowner is not liable for the delay which occurred in the transportation of the cargo herein involved, assuming the agreement is valid.

[10, 11] The admiralty courts of the United States have held, and the law in this country is well established, that a bill of lading which relieves a shipowner from all liability for the negligence of the carrier or his servants is contrary to public policy and void. The Hadji (C. C.) 20 F. 875; The Montana (C. C.) 22 F. 715, 22 Blatchf. 372; The Hugo (D. C.) 57 F. 403, modified on other grounds in (D. C.) 61 F. 860; The Orcadian (D. C.) 116 F. 930; The Good Hope (D. C.) 190 F. 597. And this principle is now established by statute. The Harter Act, being Act Feb. 13, 1893, c. 105, §§ 1, 2, 27 Stat. 445 (Comp. St. §§ 8029, 8030), expressly prohibits the insertion in any bill of lading any agreement relieving the owner of any vessel, transporting merchandise from or between ports of the United States and foreign ports, from liability arising from negligence in loading, stowage, custody, care, or proper delivery of property committed to its charge.

[12] But no case has been called to our attention which holds that such a provision as that found in the bills of lading herein involved is void, and we are not prepared to hold it to be void. While the provision in question cannot be construed to be void, or as intended to confer upon the shipowner an absolute and unrestricted liberty to delay for any length of time, and for any reason, or no reason, the transportation of the goods, still the intention of the parties must be so restricted and limited as to apply only to delays fairly ancillary to the prescribed voyage. In effect, the promise of the shipowner was to carry the goods to their destination as soon as the reasonable arrangements of the carrier respecting the voyage would allow.

So far as this unsatisfactory record discloses, the ship on her arrival at Philadelphia had New York cargo in her hold for discharge. After she had unloaded some of her cargo at Philadelphia, she went to New York to discharge her New York cargo. This having been done, she loaded there certain cargo, and then returned to Philadelphia to fill her holds. The delay at New York was due to the fact that the owner rearranged his cargo commitments, having eliminated some of his ships. The right "to remain in port" given by the bill of lading justified holding the Panola until the owner could distribute his cargo between his various ships. Under the contract the owner was not obliged to dispatch the ship with half-filled holds, or to leave unlifted any part of the freight he could carry. If it was necessary to eliminate a ship and consolidate cargoes, it was not unreasonable to do it.

In The Sidonian, 34 F. 805, the bill of lading gave permission to the vessel to call "at any port or ports in any rotation, for any purpose whatever." The bill was issued for the transportation of 1,500 boxes of lemons from the port of Genoa, Italy, to the port of New York. It was claimed that the lemons were damaged by the length of the voyage, owing to the fact that the steamship, after leaving Genoa, called at Palermo, in Sicily, where she was detained for 10 days because of a quarantine regulation. Judge Benedict, of the District Court, sustained the right of the vessel to enter the port of Genoa and dismissed the libel. He said:

"It appears from the evidence that, prior to the shipment of these lemons, a quarantine had been established at the port of Palermo, whereby a vessel coming from Genoa was compelled, before entering the port of Palermo, to go to the island of Gaeta, and there remain for the period of 10 days. There is evidence to show that, prior to the shipment of the lemons, the agent of the shipowner gave the shipper to understand that the ship would not call at Palermo on this voyage. But it also appears that, upon the shipment

of the lemons, the bill of lading upon which this action is based was issued by the ship, and received by the shipper without objection; the fact of the establishment of the quarantine at Palermo being then known to all parties. Thereafter the ship called at Palermo, that being one of the ports ordinarily touched at by the vessels of this line on their voyage to New York, and in consequence was detained by the quarantine 10 days. Upon these facts the libelant asks at the hands of this court a construction of the bill of lading, so as to exclude the port of Palermo from the liberty to call mentioned in the bill of lading, upon the ground that, after the establishment of the quarantine, the port of Palermo could not be entered under ordinary circumstances, and so was not within the contemplation of the parties to the contract. But I am unable to see how such a construction can be given to the bill of lading. The words of the liberty to call are plain, and clearly include the port of Palermo. If the shipper had desired to exempt the port of Palermo from the liberty to call contained in the bill of lading, because of the quarantine then known to have been established, he should have procured a modification of the bill of lading. Instead of so doing, he accepted the bill of lading without objection, and now brings his action upon it. It is impossible to permit him to recover in such an action, without setting aside the established rule, which makes the written contract the evidence of the agreement between the parties. The libel must be dismissed, and with costs."

The case was appealed to the Circuit Court. 35 F. 534. Justice Blatchford (of the Supreme Court of the United States), affirmed the case, saying: "I concur in the views and conclusions of the District Judge in his decision in this case."

In Austrian Union S. S. Co. of Trieste, Austria, v. Calafiore, 194 F. 377, 114 C. C. A. 295, the bills of lading were issued at Palermo, Italy, for a voyage to New Orleans. They provided that the ship might call at any ports before or after proceeding to the port of destination, "in any order, backwards or forwards, for the purpose of receiving and for delivering coals, cargo or passengers, or for any other purpose, and all such ports, places and sailings shall be deemed within the intended voyage." The bills of lading were for the carriage of a cargo of lemons from Italy to New Orleans, and when the ship arrived at New Orleans the lemons were in a badly damaged condition. It appeared that, when the ship was on its way to New Orleans, it was diverted to the port of Tampa, Florida,

where the ship was detained over six days in tropical heat loading phosphate, which the evidence showed was for return cargo, after full discharge at New Orleans. The evidence showed that the lemons were damaged by the hot weather at Tampa and by the phosphate dust arising by loading the phosphate at Tampa. The Circuit Court of Appeals for the Fifth Circuit held that the ship was liable for the damages resulting to the fruit from stopping at Tampa, as the ship had no right to stop there to take on cargo for a succeeding voyage before proceeding to New Orleans. Judge Pardee, writing for the court, said:

"Under the reservation in the bill of lading, the ship probably had a right to stop at that port 'for the purpose of receiving or delivering coals, cargo or passengers or for any other purpose,' all in case the same was proper and necessary to that voyage. See Amsinck v. Insurance Co., 129 Mass. 185, 186. The ship did stop at Tampa, not for the purposes of the voyage, but for the purpose of another voyage, to be undertaken after New Orleans should be reached. This stoppage and the delay resulting was unquestionably beyond the contemplation of the shippers at the time the bill of lading was signed. Such delay and detention undoubtedly caused the damage the lemons suffered through heat and lack of ventilation, and some of the damage to the boxes of lemons was undoubtedly caused by phosphate dust resulting from loading phosphate."

In South Atlantic S. S. Line v. London-Savannah Naval Stores Co., 255 F. 306, 166 C. C. A. 476, the bill of lading provided that the ship might "call at any port or ports, in or out of the customary route, in any order whatsoever, to receive or discharge coals, cargo, passengers, or for any other purpose. * * *" The Circuit Court of Appeals for the Fifth Circuit sustained the validity of the provision and said:

"There is no law standing in the way of a shipper under a maritime contract binding himself by an agreement that the vessel carrying his goods, constituting only a part of its cargo, is to have the privilege expressed by the provision just quoted. No right of a shipper under such a contract is violated by the vessel carrying his goods going to the port to which they are destined by way of another port, in or out of the customary route, for the delivery of other goods shipped to such other port. Austrian Union Steamship Co. v. Calafiore, 194 F. 377, 114 C. C. A. 295, was a case of a shipment under a bill of lading containing a provision quite similar to

the one above quoted. In the opinion of this court rendered in that case it was recognized that the stopping of the vessel at another port before reaching that to which the complaining shipper's goods were destined could not have justified the complaint made, but for the fact that the stop which was made was for a purpose not proper or necessary to the voyage in which the ship was engaged."

In The Blandon, 287 F. 722, the District Court for the Southern District of New York had before it a bill of lading which contained the following provision: "With the liberty to call at any port or ports in or out of the customary route in any order." The ship was to carry goods to Valencia. She left New York on May 11, 1919, bound for Philadelphia, to complete her loading. There she remained till May 19th, when she returned to New York and continued loading till May 26th. Eventually she cleared from New York May 31st, but upon putting out she found herself in unseaworthy condition from bad stowage and leaky boilers, and put back on June 1st for repairs and to retrim the ship. She remained in New York, making repairs and retrimming, till June 15th, when she finally cleared for Valencia, where she arrived on July 5, 1919.

The question which was considered in the supplemental opinion was whether the clause above quoted justified the ship in calling at Philadelphia. In answering that question the court said: "The question is whether this clause justified the ship in calling at Philadelphia, a deviation which I have held to have been otherwise unjustified. If these words are to mean anything at all, it seems to me that they must include such a stop as Philadelphia. True, it was not a stop on the customary route; at least, I must assume so on this record. Yet it was expressly agreed that the port might be 'out of the customary route.' What more limited sense can those words mean than a stop at a place some 30 hours away? It is said that the clause will allow only reasonable deviations, and this is indeed true, since such a clause is to be construed in its context."

In United States Shipping Board Emergency Fleet Corporation v. Pensacola Lumber & Timber Co., 290 F. 358, the Circuit Court of Appeals for the Fifth Circuit held that the shipper of lumber from Pensacola, Fla., to Liverpool, England, was not entitled to recover damages by reason of the decline in the market value of the timber during shipment. The court, discussing the bill of lading said: "The contract sued on did not entitle the appellee to have the goods mentioned carried promptly and directly by a steamer to Liverpool. It is not entitled to recover damages for a failure to get the benefit of a service for which it did not contract."

The same court decided the earlier case of Aktieselskabet Stavangeren v. Hubbard-Zemurray S. S. Co., 250 F. 67, 162 C. C. A. 239. In that case a cargo of bananas and cocoanuts had been shipped from Omoa, Honduras, to New Orleans. The shipment did not reach its destination at the time intended. The result was that the shipper lost over $4,000, which represented the difference between what the bananas and cocoanuts were sold for in the New Orleans market, and what he would have received if the advance orders, which had been given, had not been canceled because of the delay of arrival. The court disallowed the damages occasioned by the loss of the market and said: "The damages resulting by reason of the existence of such special circumstances, of which the party sought to be charged was not made aware, are disallowed, not because they are merely consequential or remote, but because they cannot fairly be considered as having been within the contemplation of the parties at the time of entering into the contract."

One of the leading cases holding that a shipper cannot recover damages for the loss of a market is that of The Parana, 2 P. D. 118. The case was decided in 1877 in the English Court of Appeal. The ship, which started from Manila and was to proceed to London, was on the way from 65 to 70 days longer than the fair average time for such a voyage. She carried, among other things, a cargo of hemp. There had been a fall in the price of hemp between the time when the ship ought to have arrived and the time when she did arrive, and the hemp was finally sold at a considerable loss. The court, unanimously reversing the judgment of the Admiralty Division, held that the consignee was not entitled to recover damages arising from the loss of the market. Mellish, L. J., writing for the court, said:

"The question we have to decide is whether, if there is undue delay in the carriage of goods on a long voyage by sea, it follows as a matter of course that, if between the time when the goods ought to have arrived and the time when they did arrive, there has been a fall in the price of such goods, damages can be recovered by the consignee of the goods. * * * There is no case, I believe, in which it has ever been held that damages can be recovered for delay in the carriage of goods on a long voyage by sea, where there has been what may be called a merely accidental fall in

price between the time when the goods ought to have arrived and the time when they did arrive—no case that I can discover where such damages have been recovered; and the question is, whether we ought to hold that they ought to be recovered. If goods are sent by a carrier, to be sold at a particular market; if, for instance, beasts are sent by railway to be sold at Smithfield, or fish is sent to be sold at Billingsgate, and, by reason of delay on the part of the carrier, they have not arrived in time for the market, no doubt damages for the loss of market may be recovered. So, if goods are sent for the purpose of being sold in a particular season when they are sold at a higher price than they are at other times, and if, by reason of breach of contract, they do not arrive in time, damages for loss of market may be recovered; or if it is known to both parties that the goods will sell at a better price if they arrive at one time than if they arrive at a later time, that may be a ground for giving damages for their arriving too late and selling for a lower sum. But there is in this case no evidence of anything of that kind. As far as I can discover, it is merely said that when the goods arrived in November they were likely to sell for less than if they had arrived in October, for the market was lower."

He stated the court's conclusion as follows: "Therefore, upon the whole, we have come to the conclusion that the report of the registrar and merchants is right. They said that it had never been the practice in the court of admiralty to give such damages, and though it constantly happened that by accidents, such as collisions, goods were delayed in their arrival, it never had been the custom to include in the damages the loss of market; and we are of opinion that the conclusion which the registrar and merchants came to was right. The consequence, therefore, is that the judgment of the court below must be reversed."

In The Willdomino, 300 F. 5, the bills of lading expressly gave the ship "liberty to call at intermediate ports, or any port or ports in or out of the customary route in any order to receive or discharge coal, cargo, passengers and for any other purposes. * * * " The ship took on board casks of citrate of lime, to be carried to New York. It seems that the vessel had put in at North Sydney, Nova Scotia, and one of the questions raised was whether this deviation of the vessel from her legitimate and contemplated course was authorized under the provision in the bills of lading. The Circuit Court of Appeals for the Third Circuit, in a carefully prepared opinion by District Judge Morris, said:

"In the light of the principles established by the preceding cases, the question of whether or not, under the terms of a bill of lading, a departure from the usual course of the voyage is or is not an authorized and justified deviation, is a question of fact in each case. Pertinent to such question are the customary course between the port of loading and the port of discharge, the usual ports of call, the location of the port in question, the purpose for which the vessel entered that port, and the circumstances under which she entered."

Under the circumstances disclosed the court held that the bill of lading did not justify the vessel in going to Sydney.

In Taylor v. Great Northern Railway, L. R. 1 C. P. 385, 388, Erle, C. J., said: "I think a common carrier's duty to deliver safely has nothing to do with the time of delivery; that is a matter of contract, and when, as in the present case, there is no express contract, there is an implied contract to deliver within a reasonable time, and that I take to mean a time within which the carrier can deliver, using all reasonable exertions."

In the same case Montague Smith, J., said: "Common carriers do indeed insure to this extent, that they will safely and securely carry the goods, but not to the extent of guaranteeing their arrival at any particular time."

Scrutton on Charter Parties (Ed. 1910), 235, note, states the rule on this subject as follows: "All of these clauses must be construed in the light of the commercial adventure undertaken by the shipowner. Thus, a clause giving leave 'to call at any ports' will only allow a shipowner to call at ports which will be passed in the ordinary course of the named voyage in their geographical order. The words 'in any order' will allow the shipowner to depart from geographic order; but, even when there are general words giving liberty to call at ports outside the geographic voyage, these will be cut down by the special description of the voyage undertaken to ports in the course of that voyage."

The bills of lading herein involved provide for great liberty in the matter of remaining in port, as well as in deviating from the ship's usual route. But the bills of lading, notwithstanding the liberties conferred, are not in our opinion invalid, and they excuse the acts complained of in the libel.

[13] The plaintiff contends that the trial court committed reversible error in refusing to permit him to reopen the case and put in

additional proof.. The record shows that plaintiff put in his case and rested. The defendant thereupon moved to dismiss the complaint for reasons specifically stated. This motion was argued by counsel on each side and was granted by the court. After the court had announced its ruling, the plaintiff then made application to be permitted to put in additional proof and to subpœna additional witnesses. In making his request 'to be permitted to reopen the case, he gave as his reason that he had thought he had adduced sufficient proof to authorize a judgment in his favor, 'but, as the court did not agree with him, he wanted an opportunity to put in further testimony.

[14, 15] The continuance of a pending action or of its postponement is inherent in all courts, and is generally a matter resting in the court's discretion, and reviewable only for abuse. But a party is not entitled to a continuance because he discovers he has made a mistake of law (McDonald v. Weir, 76' Mich. 243, 42 N. W. 1114), or where his application is for the mere purpose of getting better proof (Perley v. Taylor, 21 Kan. 712); and generally the facts upon which an application for a continuance is based must be verified by affidavit unless they are within the judicial knowledge of the court and not open to dispute (United States v. Frink, 4 Day [Conn.] 471, Fed. Cas. No. 15,171; People v. Mason, 63 Mich. 510, 30 N. W. 103; McKinney v. Jones, 55 Wis. 39, 11 N. W. 606, 12 N. W. 381).

The New York Rules of Civil Practice (rule 166) provide that a complaint need not be dismissed on the trial "because of failure of or defect in proof, if it shall be made to appear that the evidence to supply the defect can be produced." And in such a case the court may receive the evidence, or adjourn the trial or direct a new trial. In this case the plaintiff had rested and the complaint had been actually dismissed prior to making application to be permitted to put in the additional proof. Moreover, we do not think, in making application to be permitted to introduce new evidence, counsel made it appear that he certainly could produce the evidence necessary to supply the defect. His offer was to be permitted to offer proof which he believed he could obtain.

[16] There is another, and in itself sufficient, reason why the case should not now be reversed because of the refusal of the court below to permit the plaintiff to reopen the case after he had put in his evidence and rested. The evidence which the plaintiff wished to introduce, if it had been admitted, would not have cured the fatal defect in the plaintiff's case. The judgment must be affirmed, not because of the omission of that evidence from the record, but for the reason that no breach of the contract contained in the bills of lading is shown by the delay in the delivery of the cargo carried.

For the reasons stated, this court cannot say that there was any abuse of discretion in declining to permit the case to be reopened after the plaintiff rested.

Judge HAND heard the argument, participated in the conference on the case, and voted to affirm. He has not seen the opinion as prepared, but desires to be recorded as concurring in the result. ·

Judgment is affirmed. .